## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

MARTY WARREN, ET AL.         :
      Plaintiffs,       :    CIVIL ACTION NO.
                   :    3:04-cv-537 (JCH)
v.                    :
                   :
RICHARD WILLIAMS, ET AL    :    MARCH 31, 2006
      Defendants.     :

### RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT [DOC. NOS. 111 & 125], MOTION IN LIMINE [DOC. NO. 115], AND MOTION FOR RECONSIDERATION [DOC. NO. 139]

Marty Warren, Barbara Warren, Gary Piscottano, Allison Piscottano, Domenic F. Papsadore, Kelly Hemmeler, Clifford Hemmeler, and Philip O. LaBonte, Jr. ("plaintiffs") bring this action pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the Constitution of the United States. Named as defendants are Richard Williams, Richard Perron, Carmine Verno, Patrick Cauley, Frank Griffin, Peter Terenzi, Thomas Garbedian, Robert Burgess, Lt. Gould, Daniel Lewis, Robert Keeney, Darren Edwards, Karen Gabianelli, Julie Mooney, Eric Stevens, Justin Kelley, Joseph Voket, Troopers Jeffrey Dubuc, Mark Wyler, Raoul Palen, Steven Orlowski, Arthur Walkley, Christopher Lunz, Steven Zonghetti, Daniel McCarthy, Christopher Toney, Joseph Mercer, Eric Basak, Michael Alogna, James Kodzis, Jeffrey Covello, William Rochette, in their individual capacities, and the Commissioner, Department of Public Safety, individually and in his official capacity ("defendants").

The plaintiffs filed their original complaint in this action in April 2004. Their Second Amended Complaint asserts claims against the defendants pursuant to 42 U.S.C. §§ 1983 and 1988 under the Fourth Amendment, for executing a search warrant without probable cause; failure to knock and announce their presence; using excessive

force against the plaintiffs; exceeding the lawful scope of the search; and unlawfully detaining the plaintiffs.  The plaintiffs also assert a cause of action pursuant to 42 U.S.C. §§ 1983 and 1988 for violation of the plaintiffs' equal protection rights under the Fourteenth Amendment, alleging that the defendants have maliciously interfered with OMC's ability to rent or secure the use of properties or facilities for the purpose of holding social gatherings, and that the defendants have stopped, without reasonable suspicion or probable cause, several of the plaintiffs and required that they produce identification and be photographed.  As relief, the plaintiffs seek, in part, an injunction ordering that the photographs taken by the defendants, and any property seized by the defendants, be returned to the plaintiffs, as well as damages and attorneys' fees.  The plaintiffs have moved for partial summary judgment on their claim that the warrant lacked probable cause and was thus unconstitutional.

The defendants have moved for summary judgment on all of the plaintiffs' claims, arguing, inter alia, that several of the plaintiffs lack "standing" to challenge the constitutionality of the search warrant; the plaintiffs have not produced evidence sufficient to support their claims for relief under the Fourth Amendment; the plaintiffs have not produced evidence sufficient to support their claims for relief under the Fourteenth Amendment; and the defendants are entitled to qualified immunity for all of the plaintiffs' claims.   The plaintiffs have moved for partial summary judgment on their claim that the defendants' application for, and execution of, the search warrant was unlawful under the Fourth Amendment.

 As set forth below, the plaintiffs' motion for partial summary judgment is DENIED, and defendants' motion for summary judgment is GRANTED in part and

-2-

DENIED in part.

## I.    FACTUAL BACKGROUND[1]

The plaintiffs' claims arise out of a search conducted by the Connecticut State Police at the clubhouse of the Waterbury Outlaws Motorcycle Club ("OMC") on December 20, 2003.  The OMC clubhouse is located on the second floor of a two-story warehouse building in Waterbury, Connecticut.

Several of the plaintiffs– Marty Warren, Clifford Hemmeler, and Philip LaBonte, Jr.– are members of the Waterbury OMC.  Pls' Rule 56(a)(2) Statement, Exs. 33, ¶ 2 (M. Warren Aff.), 26, ¶ 2 (C. Hemmeler Aff.), 28, ¶ 2 (LaBonte Aff.)[Doc. No. 140]. Barbara Warren and Kelly Hemmeler are the spouses of Marty Warren and Clifford Hemmeler, respectively; Gary Piscottano is a former member of the Waterbury OMC, and Allison Piscottano is his wife; and Dominic Papsadore is a member of the Brockton, Massachusetts OMC.  Id., Exs. 27, ¶ 2 (K. Hemmeler Aff.), 29, ¶ 2 (Papsadore Aff.), 30, ¶ 2 (A. Piscottano Aff.), 31, ¶ 2 (G. Piscottano Aff.), 32, ¶ 2 (B. Warren Aff.).  The defendants are various officers and officials connected to the Connecticut State Police that the plaintiffs assert are responsible for the alleged conduct that the plaintiffs assert was unlawful.  All of the plaintiffs were present at the OMC clubhouse when the defendants executed their search warrant on December 20, 2003.

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving parties, here the plaintiffs, where there is evidence to support their allegations.

### A.    The Search Warrant

The defendants executed their search of the OMC Clubhouse on December 20, 2003, pursuant to a search warrant sought and obtained by Carmine Verno and Patrick Cauley, who are both detectives with the Connecticut State Police.[2]   The search warrant was signed by a Connecticut Superior Court Judge.

The plaintiffs challenge the lawfulness of the search warrant, arguing that it was not supported, on its face, by probable cause.  The subject of the warrant is Frank Nelson, a non-party member of the Waterbury OMC.  The warrant affidavit states, inter alia, that nine firearms are currently registered to Nelson (as of the date of the warrant application), and that Nelson, as a result of a misdemeanor conviction, is disqualified,  under Conn.Gen.Stat. § 53a-217c, from possessing any handguns. Pls' Rule 56(a)(1) Statement, Ex. 1, ¶¶ 13-14. ("Warrant").  The warrant also details efforts by the police to account for the firearms registered to Nelson.  Id. at ¶¶ 15-23. The police's efforts revealed  that three of the firearms can be accounted for as longer in Nelson's possession, despite still being registered to him.  Id. at ¶ 20.

In addition, the warrant affidavit sets forth information about Nelson's involvement with OMC.    The affiants state that Detectives Richard Perron and Richard Williams of the Statewide Cooperative Crime Control Task Force Motorcycle Gang Task Force, who are "tasked with conducting investigations of criminal activity related to Outlaw Motorcycle Gangs and members there of," have conducted

_____

[2]At the time, Detective Verno was assigned to the Statewide Firearms Trafficking Task Force, and Detective Cauley was assigned to the Statewide Cooperative Crime Control Task Force.  Defs' Rule 56(a)(2) Statement, ¶¶ 2-3 [Doc. No. 122].

interviews with "cooperative persons who have been either members or associates of motorcycle gangs. <u>Id.</u> at ¶ 5. The affiants further state that Detectives Perron and Williams have identified the organizational structure of the Outlaws Motorcycle Club, which includes the position of "Sergeant at Arms." <u>Id.</u> at ¶ 8. According to the affiants, the

> Sergeant at Arms enforces club rules for the club, inside and outside of the clubhouse. They enforce rules on non-members as well as club members who break rules. The Sergeant at Arms can be called upon to perform verbal enforcement to physically exacting retribution for violations against the club. The Sergeant at Arms member is known to carry a weapon or have weapons in close proximity. They command respect through fear and intimidation with the backing of other club members.

<u>Id.</u> at ¶ 9. The affiants also state that "Detectives Perron and Williams, through interviews and investigations, have identified Frank Nelson . . . as the Sergeant at Arms for the Waterbury Chapter of Outlaws Motorcycle Club and responsible for the security of the clubhouse." <u>Id.</u> at ¶ 11.

The warrant affidavit also summarizes information that Detectives Perron and Williams received from confidential informants. It states, in relevant part:

> Detectives Perron and Williams did contact a confidential and reliable informant herein after referred to as Informant #1. Informant #1 has provided information in the past that has proven to be credible and reliable, which has also lead to numerous arrests and conviction. Informant #1 is known to have associated with members of the Outlaw Motorcycle Club in Waterbury Connecticut. On or about the fourth week of October, Informant #1 identified Frank Nelson an [sic] Outlaw full patch member and stated that Nelson was in charge of security at the Outlaw Clubhouse. Informant #1 had recently observed Frank Nelson, while in the clubhouse, in possession of a handgun, positioned at his back, and concealed by his colors.
>
> The Detectives Perron and Williams did contact a confidential and reliable informant herein after referred to as Informant #2. Informant #2

has provided information in the past that has proven to be credible and reliable, which has also lead to numerous arrests and convictions. Informant #2 is known to have associated with members of the Outlaw Motorcycle Club in Waterbury Connecticut.  On or about the fourth week of October, Informant #2 identified Frank Nelson as an Outlaw member and stated that Nelson was the Sergeant at Arms for the Waterbury Chapter of the Outlaws.  Informant #2 has further been present at the clubhouse and has observed the butt of a gun positioned behind the bar with [sic] in the Outlaw Clubhouse.  Informant #2 had recently overheard a Frank Nelson conversation in which Nelson implied that he carried a gun for protection and that the Club is ready for the Hells Angels.

Id. at ¶¶ 25-26.  In further support of their warrant, the affiants state that;

Based on the Affiants [sic] training and experience as Connecticut State Troopers and Detectives within the Bureau of Criminal Investigations, the Affiants know and believe, that those who own firearms generally maintain possession of them for long periods of time.  That these firearms, unlike narcotics or other contraband, are not depleted by use, do not easily wear out and are not readily disposed of.  That firearms are usually considered to be of significant value and are generally maintained and secured on the person as well as in the residence, in alternate or additional residences, in motor vehicles and/or place of business, or where persons store personal property for long periods of time.  Firearms must be maintained and preserved in an environment where they will likely be kept secure from theft.  That firearms kept or secured on the person, in the residence, in alternate or additional residences, motor vehicles, and/or place of business, are usually kept readily available and easily accessible in the event a need for them arises.

Id. at ¶ 26.  Based on these statements, the affiants concluded that probable cause existed to believe that Nelson currently possessed the non-accounted-for firearms that were registered to him.  The affiants further concluded that probable cause existed to search for evidence of the crimes of criminal possession of a firearm under Conn.Gen.Stat. § 53a-217c; possession of a prohibited assault weapon under Conn.Gen.Stat. § 53-202c; sale, delivery, or transfer of a pistol or revolver under Conn.Gen.Stat. § 29-33, and/or sale or transfer of an assault weapon prohibited

-6-

under Conn.Gen.Stat. § 53-202b, at the OMC clubhouse in Waterbury.  Id. at ¶ 30.

The warrant authorized law enforcement to search Frank Nelson, as well as:

[t]he second floor of the building located at 27 Division Street in Waterbury, CT including: all attics, basements and other parts therein including storage rooms and areas, any garages, trash containers, storage sheds, the surrounding grounds, and any other structure or building(s) owned, operated, used or utilized in conjunction with the second floor of the building located at 27 Division Street, in Waterbury, CT.

Id., p. 5.  The warrant authorized the search for property consisting of the firearms registered to Nelson, other illegally possessed firearms, and evidence of the listed crimes, described as:

[a]mmunition, rounds, shell, and/or bullet casings the caliber and/or gauge of which re intended to be used by handguns and/or assault weapons and/or other illegally possessed firearms. Safes, lockers and/or containers that may or could store, contain, conceal or secrete said firearms and keys that may or could unlock firearms safes, lockers and/or containers that may or could store, contain, conceal or secrete said firearms and keys to access remote locations where said firearms may be stored. Boxes, cases and/or containers designed, used or intended to use for storage, sale, safekeeping, carrying, transferring, transportation, containing, concealing, secreteing [sic] and/or hiding all types of firearms.  Documents, paperwork, forms, receipts, and/or bills of sale regarding or related to the purchase, possession, receipt, ownership, transfer, delivery, and/or sale of handguns or assault weapons.

Id.  The warrant was granted on December 17, 2003 for a period of 14 days.  Id.

Similar search warrant applications were submitted at the same time, and search

warrants were authorized, for the search of Frank Nelson's home and automobile.

**B.      The Plan for the Execution of the Warrant**

After the search warrants were obtained, the operational planning for the

search of the OMC clubhouse became the responsibility of the Connecticut State

Police Gang Task Force, supervised directly by Sergeant Robert Burgess.  It was Sergeant Burgess's opinion, based upon his training and experience with OMC, that the use of the State Police Tactical Team to accomplish entry into the Outlaws' clubhouse was necessary to protect the safety of the police and the clubhouse occupants.  Defs' Rule 56(a)(2) Statement, ¶ 45.

This opinion was based on Sergeant Burgess's understandings and opinions regarding the Outlaws Motorcycle Club generally, and the Waterbury OMC in particular.  According to Burgess's understanding, OMC is an international "1% club" whose members believe that they are "rebels . . . operating outside of society's norms and beliefs."  Id., Tab No. 2, Burgess Aff., ¶ 13.  Apparently, Burgess's opinion was informed in part by a 1986 report, described in his affidavit, by the President's Commission on Organized Crime which concluded that the OMC was among four motorcycle clubs that had "evolved into full organized crime groups" with a national leadership structure and that OMC in particular had "a strong reputation for violence." Id. at ¶¶ 14-16.  Burgess states that his "experience with the Outlaws and similar motorcycle gangs has borne out the accuracy of these assertions."  Id. at ¶ 14.  The plaintiffs deny that Burgess's experience with the Waterbury OMC could be consistent with these assertions; plaintiffs claim that the Waterbury OMC has been under surveillance since its inception and has never been found to be engaged in crimes or criminal activity.  Pls' Rule 56(a)(2) Statement, Part I, ¶ 47.  The plaintiffs also deny that the Waterbury OMC has a structured leadership hierarchy.  Id.

Prior to 2002, the OMC had not established a chapter in Connecticut.  In late 2001, Burgess learned that an OMC chapter was being formed by several members

-8-

of other motorcycle groups.  According to Burgess, several incidents occurred in

Connecticut in 2003 that involved violence in the context of confrontations between

OMC and the Hells Angels.  Defs' Rule 56(a)(1) Statement, ¶ 53, Tab No. 2, Burgess

Aff., ¶ 20.  For example, Burgess states that, on June 28, 2003, an "incident

reportedly occurred" in which unknown members of the OMC confronted and

assaulted a member of a rival motorcycle club at the Park East Café in Waterbury,

Connecticut.  Id., ¶ 21.  The plaintiffs deny that this incident, and the other incidents

described by Burgess in his affidavit, actually occurred.  Pls' Rule 56(a)(2) Statement,

Part I, ¶ 53-65.

Based on these beliefs and understandings, Burgess believed that "extreme

precautions were necessary" to conduct a search of the OMC clubhouse as

authorized by the warrant.  Defs' Rule 56(a)(1) Statement, ¶ 66, Tab No. 2, Burgess

Aff., ¶ 32.  According to Burgess, only the Police Tactical Team had the equipment

and training necessary to breach the security measures, such as locked gates and

fences, that surrounded the OMC clubhouse.  Id. at ¶ 67.

Burgess also states that, based on his contacts with informants, he was aware

that the OMC had scheduled a Christmas party for December 20, 2003, and that a

new member was scheduled to be inducted that evening, which Burgess, based on

his experience, believed would occur in the presence of other club members.  Based

on this information, the defendants decided to execute the search warrant on the

evening of the party, before non-members and guests were to arrive, but after it was

verified that Frank Nelson was on the premises.

Burgess briefed, and received approval for, this plan with his superiors,

including Major Frank Griffin, the Commanding Officer of the Bureau of Criminal

Investigation.  In preparation for the execution of the search warrant, Burgess also

worked with Master Sergeant Daniel Lewis, the Commanding Officer of the

Emergency Services Unit.  At a briefing on December 20, 2003, Burgess also

received input from Lieutenant Thomas Garbedian, Captain Pete Terenzi, and Major

Griffin.  Approximately ten investigators from the Waterbury Police Department were

also present at the briefing.  The state police were organized into a Tactical Team,

which was to execute the initial entry into the clubhouse, and the Search Team, which

would then execute the search pursuant to the Nelson warrant.

### C.    The Execution of the Search Warrant

Factual disputes exist regarding the circumstances of the defendants' entry into

the OMC clubhouse as well as the conduct of all parties during the execution of the

warrant and ensuing search.  For the sake of clarity, the factual allegations

concerning the claims of the individual plaintiffs, as well as the circumstances of each

individual defendant's involvement, will be described in detail in Part III.  The disputed

versions of the events on the night of December 20, 2003 can be generally

summarized as follows.

According to the defendants, Tactical Teams were deployed to the front and

rear doors of the OMC clubhouse property.  The front entry team was provided with a

mechanical ram for the purpose of breaching the front door, as well as a mechanical

saw for the purpose of sawing through the chain and padlock securing the front gate.

Defs' Rule 56(a)(1) Statement, ¶ 99.  Master Sergeant Lewis, the director of the

Tactical Team, anticipated that the Tactical Team's arrival would be monitored from

within the clubhouse via security cameras, and he expected that armed resistance was possible.  Id.  The rear entry team was intended to act as a diversion for the front team so as to create confusion among the occupants of the clubhouse.  Id.  The rear entry team was provided with a mechanical ram to gain entry.  Id.

According to Master Sergeant Lewis, when the Tactical Team executed their entry, they loudly identified themselves by stating "State Police with a search warrant, get down!"  Id. at ¶ 101.  The defendants assert that the Tactical Team members did not use profanity in going about their duties.  Id. The defendants also assert that the Tactical Team was outfitted in olive drab flight suits and black ankle high boots or sneakers and bulletproof vests that conspicuously stated "state police" in two-inch gold letters on the front and back.  Id at ¶ 102.  In addition, according to the defendants, the Tactical Team was equipped with clear-lensed goggles, a black tactical helmet, a semi-automatic pistol, a machine pistol, a gas mask, a set of metal handcuffs, and at least four plastic flex-cuffs.  Id. at ¶ 102-3.   The defendants also assert that Tactical Team member are not permitted to wear balaclavas or hoods to conceal their faces.  Id. at ¶ 103.

The plan provided that the occupants of the clubhouse were to get down on the floor in response to Tactical Team commands, where they would be handcuffed and patted down for weapons.  Master Sergeant Lewis, who was stationed outside, was notified when this was accomplished, and the Search Team, led by Major Griffin, entered the clubhouse.  Id. at ¶ 104.

According to Master Sergeant Lewis, upon entering the clubhouse, he was informed by Sergeant Raoul Palen that there were no injuries.  Id. at ¶ 105.  Lewis

also attests that the clubhouse was absolutely silent when he entered, and that he was soon thereafter given permission to withdraw the Tactical Team from the clubhouse.  Id.  Subsequently, Trooper Joseph Voket was designated to write a report regarding the operation.  Id. at ¶ 106.  Voket's report indicated that 41 people were located inside the clubhouse at the time of the search warrant execution.  Defs' Rule 56(a)(1) Statement,  Tab No. 4, Lewis Aff., Tab A.  The report states that the entry teams consisted of Troopers Dubuc, Voket, Wyler, Palen, Orlowski, Walkley, Lunz, Zonghetti, McCarthy, Toney, Mercer and Basak.  Id.  The report also states that the perimeter teams included Troopers Alogna, Kodzis, Covello, and Rochette.  Id.

        Major Griffin attests that the execution plan called for members of the Search Team to pat down each handcuffed occupant for weapons, identify them for purposes of checking for outstanding warrants and documenting the identities, of those present and that, following this process, the handcuffs were removed from each occupant. Defs' Rule 56(a)(1) Statement, ¶ 114, Tab No. 4, Griffin Aff., ¶ 21.  According to Griffin, the occupants were then to be moved to the front door where a Polaroid picture of their head and upper body was to be taken prior to their release so as to protect members of the operation from false claims of excessive force and for future help in identifying the occupants should future criminal charges develop as a result of the search.  Id. at ¶ 115.   Major Griffin attests that he did not see anyone injured by State Police personnel, nor did he hear any complaints from anyone about being injured by State Police personnel.  Id. at ¶¶ 116, 118.  He attests that he offered to adjust the handcuffs of a heavy-set, older occupant with a heart condition, but the occupant declined.  Id. at ¶ 116.   Several other defendants also attest to helping a

heavy-set occupant become more comfortable.  See id. at ¶¶ 172, 189, 204, 209,

269.  The subsequent search was supervised by Sergeant Burgess and Sergeant

Darren Edward.  Id. at ¶ 117.  According to Major Griffin, he did not see anyone open

wrapped Christmas presents, but he would have authorized members of the Search

Team to do so.  Id. at ¶ 118.  The canine officers attest that the police dogs were

either outside the clubhouse or were only present at the entrance to the large room in

the clubhouse, and that they did not enter the clubhouse.  Id. at ¶¶ 216, 219.

        Other members of the Search Team also attest that they did not observe

anyone who was injured and that they assisted occupants who requested help.  See,

e.g., id. at ¶ ¶ 128, 130, 133, 134, 152, 189.  Members of the Search Team also attest

that they did not observe any property damage other than the doors that were

breached for entry.  See, e.g., id at ¶ 191.  Sergeant Burgess, who was surprised by

the number of non-member guests who were present when the State Police arrived,

attests that four individuals, including Marty Warren, consented to searches of their

cars which were parked in the compound.  Id. at ¶¶ 79, 83.  According to Sergeant

Burgess, the scene within the clubhouse immediately following the entry of the

Tactical Team "appeared to be relatively calm given the circumstances and the

number of people present." Id. at ¶ 77, Tab No.  3, Burgess Aff., ¶ 40.

        The plaintiffs' version of these events differs in many material respects.

According to the plaintiffs, the defendants were monitoring the arrival of party guests

prior to their entry, and infer that the defendants must have been aware that 41

people were in the clubhouse at the time they executed the warrant.  According to the

plaintiffs, the front door of the clubhouse was unlocked and open when the

defendants entered.  Pls' Rule 56(a)(2) Statement, ¶ 45.[3]  The plaintiffs assert that the

defendants were dressed in black clothing with "black coverings" on their faces, and

wore nothing that identified them as police officers.  Id. at ¶ 46.  The defendants

allegedly did not knock or announce their presence before entering the clubhouse and

did not identify themselves as police; instead they screamed at the occupants to get

down, using profanity.  Id.  The defendants pointed their weapons at the faces and

chests of the occupants, and attack dogs were brought into the clubhouse, where they

aggressively barked at, and appeared threatening to, people handcuffed on the floor.

Id.  According to Barbara Warren, a defendant continued to point his weapons after

she had been handcuffed.  Pls' 56(a)(2) Statement, B. Warren Aff., ¶ 9.

Several of the plaintiffs attest that they were injured by the force that the police

used in securing the club house.  For example, Clifford Hemmeler attests that a

Tactical Team member placed a foot on his head while another strapped his wrists so

tightly behind his back that his wrists and fingers went numb.  Id. at ¶ 47.  Hemmeler,

as well as other plaintiffs, attest that many occupants were complaining about injuries

and that no one on the Tactical Team responded to them, nor did anyone on the

Search Team respond to his complaints about the tightness of his handcuffs.[4]  Id. at

---

[3]There appears to be some confusion in the record regarding the doors to the
clubhouse.  Trooper Voket's Investigative Report indicates that the front door was found
unlocked.  Pl's Rule 56(a)(2) Statement, Ex. 21.  However, the defendants claim that
this statement refers to a door at the top of the stairwell inside the clubhouse structure.
According to the defendants, a reinforced steel door at the bottom of the stairwell was
found locked, and the defendants forced entry through that door, as well as through the
rear door.  Defs' Reply, p. 15.

[4]The defendants argue that the statements of the plaintiffs that they heard
complaints being made is hearsay and should thus not be considered as evidence on

¶¶ 51-52.  Gary Piscottano attests that he was kicked and stepped on, and that a

Tactical Team members grabbed his hair and yanked his head back and to the side.

Id. at ¶ 95.  Other plaintiffs also attest that they were injured by the application of

handcuffs and that their complaints were not adequately attended to.  See, e.g., id. at

¶ 34, 69.

        According to the plaintiffs, the defendants' decision to photograph all of the

occupants of the clubhouse significantly lengthened the plaintiffs' period of detention

in handcuffs.[5]  Id. at ¶ 16.  In addition, the defendants extensively photographed the

clubhouse, including taking page-by-page pictures of the OMC Chapter list discovered

during the search.  Id. at ¶ 17.  The defendants did not, however, take photographs of

anyone's wrists.  Id. at ¶ 20.  The defendants allegedly opened wrapped Christmas

gifts during the search, and destroyed some property, such as a glass case and

booths, in the clubhouse.  Id. at ¶ 133. Several plaintiffs attest that they were

───────────────────

summary judgment.  The statements are not necessarily being offered for the truth of
the matter asserted within them, i.e., that the people who complained of injury actually
had injuries, and are thus not inadmissible hearsay. Fed.R.Evid. 801(c).  Moreover, the
affidavits by non-parties regarding their own complaints are relevant to the plaintiffs'
action as they corroborate the plaintiffs' statements regarding the amount of force they
observed being used and are relevant to the statements by some of the plaintiffs that,
because of the force they observed around them, they were afraid to complain about
their own injuries.

        [5]As an exhibit to their reply brief, the defendants have included three pictures of
occupants that were taken during the search in which the individuals were not
handcuffed.  Defs' Reply, Ex. 7.  That three individuals were not handcuffed does not
necessarily render the statements of the plaintiffs that they were handcuffed until their
pictures were taken untrue, let alone constitute an "outright misrepresentation of fact."
Defs' Reply, p. 16.  The other "misrepresentations of fact" by the plaintiffs highlighted by
the defendants in their reply brief largely demonstrate the number of material issues of
fact that exist in this action, and do not, contrary to the defendants' assertions,
demonstrate their entitlement to summary judgment.

searched in a manner exceeding a typical "pat-down" search.  See e.g., id at ¶¶  81,

133.  According to Marty Warren, the search of his truck was not consensual.  Id. at ¶

134.

A redacted report written by Sergeant Burgess following the search states that

the scene was cleared in two and a half hours, and that two handguns were seized

from occupants which would result in the issuance of three arrest warrants.  Def's

Rule 56(a)(1) Statement, Tab No. 2, Burgess Aff., Tab D, p. 2.  The report also notes

that, "2 DOC officers were located inside the clubhouse which should aid DOC in their

investigation regarding these officers and their association with an outlaw motorcycle

gang," and "[b]efore and after photos and video were taken, as is procedure, in

addition to numerous photos of intelligence value."  Id.  The defendants conceded at

oral argument, however, that no video was taken, apparently, because it was

discovered at the scene that the video camera was not operational.   It is unclear to

the court whether the photographs taken by the defendants, and submitted by the

plaintiffs in support of their opposition to summary judgment, are consistent with a

"before and after" photograph procedure.  Pls' Rule 56(a)(2) Statement, Ex. 16.

## II.     LEGAL STANDARD

Summary judgment is appropriate only when no genuine issue of material fact

exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); Hermes Int'l v. Lederer de Paris Fifth Ave, Inc., 219 F.3d 104, 107 (2d Cir.

2000).  The moving party bears the burden of showing that no genuine factual

dispute exists.  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)).


"A fact is 'material' for these purposes when it might affect the outcome of the suit

under the governing law."  Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.

2005)(quotation marks omitted).  When reasonable persons applying the proper legal

standards could differ in their responses to the questions raised on the basis of the

evidence presented, the question is best left to the jury.  Sologub v. City of New York,

202 F.3d 175, 178 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the

nonmoving party must "set forth specific facts showing that there is a genuine issue

for trial," Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986), and present such

evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230

F.3d 34, 38 (2d Cir. 2000).  A party may not rely "on mere speculation or conjecture

as to the true nature of the facts to overcome a Summary Judgment Motion."  Lipton

v. The Nature Company, 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire

Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).  Additionally, a party may not rest on the

"mere allegations or denials" contained in his pleadings.  Goenaga v. March of Dimes

Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Ying Jing Gan v. City of

New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on

conclusory statements or an argument that the affidavits in support of the Summary

Judgment Motion are not credible).  Moreover, "the mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Jeffreys, 426 F.3d at 554.

## III.    DISCUSSION

### A.    Constitutionality of the Warrant

#### 1.    Fourth Amendment "Standing" of Non-Member Plaintiffs

As a threshold matter, the defendants challenge the "standing" of several of the plaintiffs to assert a claim regarding the constitutional sufficiency of the warrant authorizing the defendants' search of the OMC Clubhouse.[6]  The defendants argue that the non-OMC member plaintiffs, Dominic Papsadore, Gary Piscottano, Allison, Piscottano, Kelly Hemmeler, and Barbara Warren, lacked a reasonable expectation of privacy in the OMC clubhouse such that they are unable to assert claims under the Fourth Amendment.

In order to be able to state a claim under the Fourth Amendment, the non-member plaintiffs must show that they had an expectation of privacy in the OMC clubhouse and that their expectation of privacy was reasonable.  United States v. Osorio, 949 F.2d 38,  40 (2d Cir. 1991).  A  subjective expectation of privacy is

---

[6] The Supreme Court has rejected the use of a "standing" doctrine in favor of an analysis under substantive Fourth Amendment law. See Minnesota v. Carter, 525 U.S. 83, 87-88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); Rakas v. Illinois, 439 U.S. 128, 139-140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). However, the court finds the term "standing" useful when discussing Fourth Amendment issues under the appropriate "reasonable expectation of privacy" analysis. See, e.g., United States v. Fields, 113 F.3d 313, 320 (2d Cir.1997) (discussing the defendant's ability to assert his Fourth Amendment rights using "standing" terminology while recognizing the analysis is separate from traditional standing doctrine.).

legitimate when it is one that society is prepared to accept as reasonable.  <u>Minnesota v. Olson</u>, 495 U.S. 89, 95-96 (1990)(citing <u>Katz v. United States</u>, 39 U.S. 347, 361 (1967)).  "A [person asserting a Fourth Amendment claim] lacks 'standing' in the Fourth Amendment context when his contacts with the searched premises are so attenuated that no expectation of privacy he has in those premises could ever be considered reasonable."  <u>Fields</u>, 113 F.3d at 320.

The defendants argue that, because the non-member plaintiffs lacked any possessory interest in the clubhouse, and because they were merely "occasional visitors," they lacked a reasonable expectation of privacy entitling them to protection under the Fourth Amendment.  In support, the defendants cite to this court's decision in <u>United States v. Elmore</u>, 359 F.Supp.2d 105 (D.Conn. 2005), in which the court found that the defendant did not have a reasonable expectation of privacy in an apartment in which he stored a bag containing contraband, but had only visited several times over a period of a year or two, "did not have a key to the apartment, did not pay rent, did not take meals, could not come and go as he pleased, and never stayed overnight."  359 F.Supp.2d at 117.  Evidence in <u>Elmore</u> also suggested that the defendant only stayed for about five minutes on the occasions that he visited the apartment in question.  <u>Id.</u> at 117.

The defendants additionally cite to <u>Minnesota v. Carter</u>, 525 U.S. 83, 90 (1998), in which the Supreme Court found that the respondents, who were "essentially present" in an apartment for a business transaction for a mere  "matter of hours," did

not have a reasonable expectation of privacy.[7]  Id. at 90.  The Court, referring to Olson, noted that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."  525 U.S. at 90.

In response, the plaintiffs argue that, as invitees to the non-public Christmas party at the OMC Clubhouse, they are more akin to the overnight guest in Olson, and that they had a reasonable expectation of privacy deserving of society's protection.  In Olson, the Supreme Court found that an overnight guest had a reasonable expectation of privacy given that "staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society . . . . We will all be hosts and we will all be guests many times in our lives.  From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home."  495 U.S. at 98.

The court finds that the non-OMC member plaintiffs did have a expectation of privacy in the OMC clubhouse and that their expectation of privacy was reasonable. The deposition excerpts submitted by the defendants in support of their position demonstrate that the Christmas party was a private affair to which entry was limited to word-of-mouth invitees of the Waterbury Outlaws.  See Def's Rule 56(a)(2) Statement, Ex. E., Depo. of Dominic Papsadore, p. 88 (noting someone controlled access to gate of clubhouse on night of the party); Ex. F, Depo. of Gary Piscottano, p.

---

[7]The two defendants in Carter bought the "right" to use the apartment as a place to bag drugs by giving the lessee an eight of an ounce of cocaine.  525 U.S. at 86. They had never been in the apartment before.  Id.

95 (same).  Thus, while the court notes that the plaintiffs did not enjoy the special privacy interests normally afforded to private residences under the Fourth Amendment, the plaintiffs did have a much greater expectation of privacy in the clubhouse than they would if the party were convened at a public bar or restaurant.

The court notes that the clubhouse was a communal space that served as the center of activity for a group of people who chose to associate with one another as a group.  In this sense, the clubhouse is a unique, but not uncommon, place, in our social world.  Like other social clubs and lodges, it is outside of the home, yet remains private and, thus, qualitatively different from the other public spaces it resembles physically.  The private nature of such a communal space is a constitutive element of the space; it facilitates non-familial, communal associations that ultimately serve valuable and civic ends in our society.  To be sure, a clubhouse is not a home, but, like a home, it enables unique private relations among citizens.

The nature of the clubhouse, of course, does not itself confer "standing" on the non-member plaintiffs.  See Katz v. United States, 389 U.S. 347, 351 (1976)("The Fourth Amendment protects people, not places.").  But it does inform the nature of what it is to be a "guest" at the Christmas party gathering in the clubhouse.  The gathering was, as the evidence indicates, a purely social affair that could itself be characterized as a "longstanding social custom" that "serves functions recognized as valuable by society."  495 U.S. at 98.  See also Oliver v. U.S., 466 U.S. 170, 179 (1984)(describing the Katz reasonable expectation inquiry as protecting "intimate activities.").  While their time in the clubhouse was brief, the plaintifs were present in the context of a private social function more worthy of protection than the "bag-

-21-

storing" activity in Elmore, or the "bagging" activity in Carter.  The non-member

plaintiffs were not merely at the clubhouse for a brief business transaction, as in

Carter, but were present specifically as invited guests.  The court also notes that two

of the non-member plaintiffs are wives of Waterbury OMC members, another plaintiff

is a former Waterbury OMC member (and another plaintiff is his wife), and another

plaintiff is an member of a different OMC chapter.  Thus, unlike in Carter, the non-

member plaintiffs had previous relationships, in varying degrees, with the "hosts" of

the premises that would support the reasonable expectation on the part of the guests

that the hosts have offered to "share their privacy" with their guests, while maintaining

the private nature of the function.  See Olson, 495 U.S. at 99.  Considering the nature

of the clubhouse, the purpose of the gathering, and the relationships between the

plaintiffs, it is reasonable to conclude that the non-member plaintiffs were "taken in" to

share in the privacy of the clubhouse, like the overnight guest in Olson, id., and were

not merely "allowed to be present," like the drug dealers in Carter, 525 U.S. at 91.

Accordingly, the court finds that all of the plaintiffs had a reasonable

expectation of privacy in the OMC clubhouse at the time the defendants executed the

warrant on December 20, 2003.  Thus, all plaintiffs are able to state claims under the

Fourth Amendment regarding the constitutionality of the search warrant.[8]

2.      The Sufficiency of Probable Cause

---

[8]The court realizes that a separate argument might be made regarding Dominic
Papsadore's individual expectation of privacy in the clubhouse, as his connection to the
clubhouse is more attenuated than the other non-member plaintiffs.  However, the
defendants have not raised this argument, and the court therefore will treat all of the
non-member plaintiffs together.

The plaintiffs have moved for partial summary judgment on their claim
regarding the constitutionality of the warrant, arguing that the undisputed facts
demonstrate that a reasonably well trained officer should have known that the
allegations of the warrant affidavit failed to establish probable cause for the search.
The defendants have also moved for summary judgment on the plaintiffs' claim,
arguing that the warrant affidavit sufficiently demonstrated the existence of probable
cause and that the defendants are entitled to qualified immunity for the plaintiffs'
claim.  The determination of this issue turns solely on the sufficiency of the
statements included in the warrant affidavit, which are not in dispute, and thus this
claim is capable of being resolve on summary judgment.  See Aguilar v. Texas, 378
U.S. 108, 109 n.1 (1964).

As the Supreme Court made clear in Saucier v. Katz, 533 U.S. 194 (2001), the
court must first determine whether a constitutional violation occurred, i.e., whether the
search of the OMC clubhouse was not properly predicated upon probable cause,
before determining whether the defendants are entitled to qualified immunity.  Id. at
201; see also Cowan v. Breen, 252 F.3d 756, 761 (2d Cir. 2003).  Thus, the court will
first address the sufficiency of the warrant affidavit before considering the question of
qualified immunity.

"[E]xcept in certain carefully defined classes of cases, a search of private
property without proper consent is 'unreasonable' unless it has been authorized by a
valid search warrant." Groh v. Ramirez, 540 U.S. 551, 560 (2004). "It is established
law . . .  that a warrant affidavit must set forth particular facts and circumstances
underlying the existence of probable cause."  Franks v. Delaware, 438 U.S. 154, 165

-23-

(1978). "[T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis . . . for conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires nothing more." Illinois v. Gates, 462 U.S. 213, 236 (1983)(quoting Jones v. United States, 362 U.S. 257, 271 (1960)). "Presented with a warrant application, the judge must "simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." U.S. v. Martin, 426 F.3d 68, 74 (2d Cir. 2005)(quoting Gates, 462 U.S. 213 at 238).

"The essence of probable cause is a reasonable, objective basis for belief in a suspect's guilt, although not necessarily proof of guilt beyond a reasonable doubt." United States v. Webb, 623 F.2d 758, 761 (2d Cir. 1980). "[P]robable cause is a fluid concept– turning assessment of probabilities in particular factual contexts– not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 213, 232 (1983). Moreover, "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts." Id. at 236 (internal quotation marks omitted).

The defendants assert that the following information in the warrant affidavit supports the conclusion that, on December 17, 2003, the police had probable cause to search the OMC clubhouse for evidence implicating Frank Nelson in the crimes of illegal gun possession or illegal firearm transfer: nine firearms, six of which are

unaccounted for, are "currently registered to Nelson; one confidential informant ("CI #2") has informed the police that Frank Nelson is the "Sergeant-at-Arms" of the Waterbury OMC, a position which the state police believe, based on their training and experience regarding the OMC nationally, would make it likely that Nelson would carry a firearm or store firearms at the OMC clubhouse; another confidential informant ("CI #1") stated to the police that Nelson was in charge of security at the OMC clubhouse; CI #1 informed the police, in the fourth week of October 2003, that he "recently" observed Frank Nelson in possession of a handgun; and CI #2, in the fourth week of October 2003, "recently" overheard a conversation in which Nelson "implied that he carried a gun for protection."  Pl's Rule 56(a)(1) Statement, Ex. 1, ¶¶ 24-25.  The warrant also includes the general observation by the affiants, based on their training and experience, that people who own firearms generally maintain possession of them of a long period of time and that they are often stored by individuals in a variety of places.  Id. at ¶ 26.

The plaintiffs argue that this information fails to establish probable cause for several reasons.  With regard to the information regarding the "currently registered" firearms, the plaintiffs point out that the defendants' own efforts to locate the registered firearms demonstrate that there is a lack of correlation between the registration status of a firearm and its possession (i.e., one of the firearms "currently registered" to Nelson have been out of his possession since 1989, and two others since 1994).  Furthermore, as the plaintiffs observe, it was not illegal for Nelson to possess the firearms in question until 1994, nor was he required, as both parties concede, to record and report the transfer of his firearms until such requirements were

enacted in 1994.  Thus, the plaintiffs argue, it is unreasonable to draw the inference

that Nelson is still in possession of the handguns in question, or that he transferred

them illegally, given that the warrant affidavit fails to state <u>when</u> the firearms in

question were registered to him, and Nelson may have had an ample opportunity to

legally transfer possession of the firearms.[9]

The plaintiffs also argue that the statements in the warrant affidavit regarding

the information received from the confidential informants in October 2003, about their

"recent" observations of Frank Nelson was stale and fatally vague, and thus could not

support a finding of probable cause.[10]  "While there is no bright line rule for staleness,

the facts in an affidavit supporting a search warrant must be sufficiently close in time

to the issuance of the warrant and the subsequent search conducted so that probable

cause can be said to exist as of the time of the search and not simply as of some time

in the past."  <u>United States v. Wagner</u>, 989 F.2d 69, 75 (2d Cir. 1993).  "Two critical

factors in determining whether facts supporting a search warrant are stale are the age

of those facts and the nature of the conduct alleged to have violated the law."  <u>United</u>

<u>States v. Ortiz</u>, 143 F.3d 728, 732 (2d Cir. 1998)(internal quotation marks omitted).

"Moreover, when the supporting facts present a picture of continuing conduct or an

_____

[9] Evidence submitted by the plaintiffs in response to the defendants' motion for summary judgment indicates that one of the unaccounted-for guns "currently registered" to Nelson were registered in 1988, two in 1990, one in 1993, and another in 1994.  Pl's Rule 56(a)(2) Statement, Ex. 18.  While not addressed in the parties' pleadings, the court, at oral argument, considered the possibility that the failure to include this information in the warrant affidavit was a material omission under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

[10] The plaintiffs have also reserved the right to challenge the reliability of the information received from the confidential informants.

ongoing activity, . . .the passage of time between the last described act and the presentation of the application becomes less significant." Id. (internal quotation marks omitted).

The court shares the doubts raised by the plaintiffs regarding the information concerning the firearms registered to Frank Nelson.  For the reasons argued by the plaintiffs, that information alone does not sufficiently support, for purposes of probable cause, the inference that Frank Nelson is now in possession of firearms in violation of Connecticut law, or that Frank Nelson illegally transferred firearms, let alone the inference that evidence of these crimes may be found at the OMC clubhouse. However, the fact that Frank Nelson once possessed six guns which are now not accounted-for is at least relevant to the probable cause inquiry and could support the inference, when coupled with other evidence, that there is a "fair probability" that evidence of a firearms violation may be found at the OMC clubhouse.  See Webb, 623 F.2d at 761 ("[F]acts ostensibly sufficient to establish probable cause for an arrest are not negated simply because such facts may be consistent with the suspect's innocence.").

The sufficiency of the warrant affidavit turns, then, on the relevance and reliability of the information supplied by the confidential informants.  The court is troubled by the lack of specificity in the warrant affidavit concerning the dates on which the confidential informants learned the information described therein.  The court can discern no legitimate reason for failing to include the specific date, or range of dates, on which the informants learned the information in question, if known to the police, so as to enable the reviewing judicial officer to determine whether the

-27-

information is stale or not.  If the date the information was acquired is not known to the police, then <u>that</u> information should be included in the warrant affidavit as it is obviously material as to whether the information is reliable as of the date of the warrant application.  Nonetheless, the vagueness of the term "recently" is not, alone, fatal to the reliability of the information supplied by the confidential informants.  <u>See</u> <u>Rivera v. United States</u>, 928 F.2d 592 (2d Cir. 1991)(finding that the omission of the date on which a confidential informant learned of the information included in a warrant affidavit did not necessarily render the information stale given that, under the circumstances of the case, the date the information was received could be reasonable inferred and that the criminal activity in question was continuous in nature).  The court will thus accord the term "recently" in the warrant affidavit its common-sense meaning of "close in time," and infer that the confidential informants learned of the information described in the warrant affidavit soon before the last week of October 2003.

The defendants have argued that Nelson's status as Sergeant-at-Arms, in light of the general knowledge that the affiants had through their training and experience regarding the nature of the Outlaws and its leadership hierarchy, demonstrate that the information provided by the confidential informants "present[s] a picture of continuing conduct or an ongoing activity," and thus the information provided by the confidential informants regarding Nelson's possession of firearms should not be regarded as stale.  <u>See</u> <u>Ortiz</u>, 143 F.3d at 732.   This characterization of the import of Nelson's alleged position and status is fair.  Believing that Nelson is the Sergeant-at-Arms would make reasonable the inference that the observation of Nelson in possession of a firearm at the OMC clubhouse in October 2003 is relevant to the belief that Nelson

would likely be in possession of a firearm at the OMC clubhouse in December 2003.

While the plaintiffs have disputed whether Nelson is in fact the Sergeant-at-Arms of

the Waterbury OMC, and have disputed whether it is reasonable to ascribe to the

Waterbury OMC the reputation for criminal activity and violence associated with the

OMC nationally, it would not be unreasonable for the affiants to believe, on the basis

of the information supplied by the informants, even if they were ultimately mistaken,

that Nelson held a position at the Waterbury OMC that made it likely that he illegally

possessed firearms at the OMC clubhouse on an ongoing basis.

Accordingly, if the information provided by the confidential informants were to

be found reliable, the court finds that, in considering the totality of the circumstances

set forth by the defendants in the warrant affidavit, that the warrant affidavit

sufficiently demonstrated the existence of probable cause to support the defendants'

search of the OMC clubhouse.  See Gates, 462 U.S. at 230-31 (articulating "totality-

of-the-circumstances" approach to the probable cause inquiry).  The information

presented in the affidavit concerning Nelson's past possession of firearms, together

with the information provided by the confidential informants regarding his status as

Sergeant-at-Arms of the Waterbury OMC, and the information provided by the

confidential informants regarding his actual possession of firearms, provides an

objective basis for the belief that there is a fair probability that evidence of wrongdoing

on behalf of Frank Nelson could be discovered at the OMC clubhouse.  Martin, 426

F.3d at 74.

Under a previous ruling of this court, the plaintiffs have only viewed redacted

versions of information provided to the court in camera by the defendants to

demonstrate the reliability of the confidential informants.  <u>Ruling</u>, July 11, 2005 [Doc.

No. 104].  The plaintiffs have moved for reconsideration of this ruling, arguing that

they require full access to the information in question in order to challenge the

reliability of the informant statements included in the warrant affidavit.

       The court has again reviewed the information provided by the defendants <u>in</u>

<u>camera</u> to determine whether, under the applicable standards, a material issue of fact

may exist with regards to the reliability of the CI statements in the warrant affidavit that

might call the sufficiency of the probable cause basis of the warrant affidavit into

question.

       The reliability of information provided by a confidential informant can be

established if "the person providing the information has a track record of providing

reliable information, or if it is corroborated in material respects by independent

evidence."  <u>United States v. Wagner</u>, 989 F.2d 69, 72-73 (2d Cir. 1993).  "If a

substantial amount of information from an informant is shown to be reliable because

of independent corroboration, then it is a permissible inference that the informant is

reliable and that therefore other information that he provides, though uncorroborated,

is also reliable."  <u>Id.</u>

       Typically, and most often in the context of a suppression hearing, an

informant's reliability can be established by testimony by a law enforcement officer

regarding previous information learned from an informant.  <u>See</u> <u>United States v. Pena</u>,

961 F.2d 333, 340 (2d Cir. 1992).  Here, the defendants have submitted

documentation evidencing that both informants had provided information to the

defendants over the course of several years, that information from both informants

has been corroborated by other sources, and that the information, and cooperation, of the informants has led to several arrests and conviction.  In addition, where the documentation does not itself demonstrate the corroboration of the information provided by the informants, law enforcement officers have represented that particular information has been corroborated by other sources.  The court, on the basis of the materials submitted in camera, finds that no material issue of fact exists with regard to the reliability of the confidential informants.

Therefore, the defendants have demonstrated that the search warrant was supported by probable cause.  Accordingly, the court does not reach the question of qualified immunity.  The plaintiffs' partial motion for summary judgment and motion for reconsideration are DENIED.  The defendants' motion for summary judgment is GRANTED as to the plaintiffs' claim regarding the sufficiency of the warrant affidavit.

**B.    Evaluating the Defendants' Alleged Actions**

The plaintiffs assert several claims under the Fourth Amendment regarding the manner of the defendants' entry into, and search of, the OMC clubhouse.  The claims can be grouped into two general categories of Fourth Amendment claims: (1) those challenging the reasonableness of particular alleged searches and seizures of objects conducted by the state police in the course of the execution of the search warrant, and (2) those challenging the reasonableness of the force used, including the seizure and detentions of individuals, in executing the warrant.  Both of these categories include claims that are asserted on behalf of all of the plaintiffs and claims that are asserted only on behalf of particular plaintiffs.  In addition, several of these claims could be asserted against all of the defendants, a particular group of defendants, or

particular defendants.  For the sake of clarity, the court will first address the general

claims in each category (i.e., those claims that are asserted on behalf of all plaintiffs),

and then turn to the individual claims of the plaintiffs and the individual liability of the

defendants.

 In its motion for summary judgment, the defendants argue that no genuine

issue of material fact exists as to 1) the reasonableness of the defendants' actions,

even when the evidence is viewed in the light most favorable to the plaintiffs, and 2)

the defendants' entitlement to qualified immunity on all of the plaintiffs' claims.

 "As a general rule, police officers are entitled to qualified immunity if (1) their

conduct does not violate clearly established constitutional rights, or (2) it was

objectively reasonable for them to believe their actions did not violate those rights."

Kerman v. City of New York, 374 F.3d 93, 108 (2d Cir. 2004)("Kerman II").   The

matter of whether a right was clearly established is a question of law, while the matter

of whether a defendant's conduct was objectively reasonable is a mixed question of

law and fact.  Id.  In Cowan v.  Breen, the Second Circuit explained the process for

evaluating claims of qualified immunity in excessive force claims under the analysis

laid out by the Supreme Court in Saucier v.  Katz, 533 U.S. 194, 201-02, 205 (2001)

and preceding cases:

> The threshold question is whether the facts, taken in the light most
> favorable to the plaintiff, show a constitutional violation. The inquiry is
> whether the alleged use of excessive force was objectively reasonable.
> Thus, claims that an officer made a reasonable mistake of fact that
> justified the use of force are considered at this stage of the analysis. If
> the plaintiff fails to establish a constitutional violation, the qualified
> immunity inquiry ends and the plaintiff may not recover.  If, however, a
> constitutional violation can be shown, the court must then determine
> whether the constitutional right was clearly established at the time of the

> constitutional violation.  This inquiry focuses on whether it would be
> clear to a reasonable officer that his conduct was unlawful in the
> situation he confronted. . . .This inquiry adds a 'further dimension' to the
> qualified immunity analysis by acknowledging that reasonable mistakes
> can be made as to the legal constraints on particular police conduct . . . .
> And it ensures that all but the plainly incompetent or those who
> knowingly violate the law are protected from suit.

352 F.3d 756, 761 (2d Cir. 2003)(citations omitted).  Under this standard, summary

judgment may be appropriate even when a material fact issue exists on an excessive

force claim if the "law did not put the officer on notice that his conduct would be clearly

unlawful." Saucier, 533 U.S. at 202.  However, summary judgment is not appropriate

where material issues of fact exist with regard to both the underlying constitutional

violation and the availability of the immunity defense.  See Kerman II, 374 F.3d at109

("Although a conclusion that the defendant official's conduct was objectively

reasonable as a matter of law may be appropriate where there is no dispute as to the

material historical facts, . . . if there is such a dispute, the factual questions must be

resolved by the factfinder."); Cowan, 352 F.3d at 764 (denying summary judgment

because "genuine, material, factual disputes overlap both the excessive force and

qualified immunity issues."); Kerman v. City of New York, 261 F.3d 229, 240

(2001)("Kerman I")(finding summary judgment on qualified immunity grounds is not

appropriate where the parties' versions of the facts differ markedly and the facts in

dispute are material to a determination of reasonableness).   The same qualified

immunity analysis is performed by courts in cases involving unreasonable search and

seizure claims under the Fourth Amendment. See, e.g.,  Caldarola v. Calabrese, 298

F.3d 156, 161 (2d Cir. 2002).

      In evaluating the plaintiffs' claims, the court will first determine, with regard to

each claim, whether the evidence could support the finding of a constitutional violation.  If so, the court will then determine whether the defendants in question are entitled to qualified immunity, or whether their alleged actions either violated clearly established law or are incapable of being determined on summary judgement due to the material facts in dispute.

### C.    Particular Searches and Seizures

Although the plaintiffs argue that the defendants' actions should be analyzed as a whole, under a "totality of the circumstances" approach, particular searches and seizures are ordinarily analyzed as individual "constitutional events."  See, e.g., Arizona v. Hicks, 480 U.S. 321, 325 (1986). The court will similarly analyze the defendants' alleged actions as individual events, as it could not meaningfully determine whether all of the defendants' conduct over the two and a half hour period in which the state police were in the OMC clubhouse was an unreasonable search and seizure under the Fourth Amendment, or whether the defendants are entitled to qualified immunity for the totality of their acts.  Accordingly, the court will consider, in turn, whether the defendants[11] violated the plaintiffs' constitutional rights when they 1) photographed each occupant at the OMC clubhouse before permitting them to leave, 2) photographed the contents of the clubhouse, 3) searched the incidental belongings of occupants, such as pocketbooks, 4) searched the cars present at the OMC "compound," and 5) allegedly seized Marty Warren's address book.

Generally speaking, "if the scope of the search exceeds that permitted by the

---

[11] The extent to which individual defendants may be liable for the viable claims will be addressed below.

terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." Wilson v. Layne, 526 U.S. 603, 611 (1999)(quoting Horton v. California, 496 U.S. 128, 140 (1990).  "[T]he Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion."  Id.  Searches and seizures during the execution of a warrant not directly related to the objectives of the intrusion may be permissible if they relate to some other legitimate governmental objective, such as a limited search of detained persons for security reasons, Rivera v. United States, 928 F.2d 592, 606 (2d Cir. 1991), or the seizure of plain-view criminal contraband, whose incriminating nature is immediately apparent, Minnesota v. Dickerson, 508 U.S. 366, 375 (1993).  With these principles in mind, the court will consider the particular searches in question.

      1.    Photographs of Occupants

      The plaintiffs have produced evidence demonstrating that the defendants required every occupant of the OMC clubhouse, including the plaintiffs, to be photographed before they were allowed to leave the clubhouse.  The photographs submitted as exhibits by the plaintiffs are generally "head-shots" of the clubhouse occupants in which the subject is pictured from the mid-waist up.  Pls' Rule 56(a)(2) Statement, Ex. 16.  In addition to the "head-shot" pictures, the defendants also photographed several of the occupants while they were detained and handcuffed on the floor.  Id.

      The plaintiffs argue that the head-shot photographs constituted seizures that were unreasonable in that they were beyond the scope of the search warrant and

lacked any other legitimizing purpose.  As the Second Circuit made clear in <u>Caldarola v. County of Westchester</u>, 343 F.3d 570, 574 (2d Cir. 2003), the seizure of a person's image through a recording device constitutes a seizure under the Fourth Amendment. In addition, the plaintiffs' reasonable expectation of privacy supporting their claim to a privacy interest protected by the Fourth Amendment is at least as great as that of the plaintiff in <u>Caldarola</u>, who was videotaped while on the grounds of the Department of Corrections, 343 F.3d at 575, as well as the plaintiff in <u>Lauro v. Charles</u>, 219 F.3d 202, 212 (2d Cir. 2000), in which the plaintiff was photographed during a "perp walk" on a private street.

In response, the defendants have argued that the photographs were justified as they were taken in furtherance of several legitimate governmental objectives.  <u>See Lauro</u>, 219 F.3d at 212.  In particular, the defendants argue that the photographs were taken "(1) to preserve for investigative purposes a record of the individuals present at the Christmas party during the execution of the search and seizure warrant, and (2) to protect themselves against false claims of police brutality."[12]  Def's Memo. of Law. in Sup. of Mot. for Summ. Judg., p. 36 [Doc. No. 127].

In <u>Caldarola</u>, the Second Circuit noted that videotaping interactions between police officers and individuals could serve the legitimate governmental purpose of protecting individuals from police abuse and protecting police from false accusations of abuse.  343 F.3d at 576.  Here, however, genuine issues of material fact exist with

---

[12]At oral argument, the defendants also suggested that the photographs were necessary to verify the identities of the party guests, although the defendants could not point to any evidence in the record or otherwise to demonstrate that the photographs were used for this purpose.

regard to whether the police action in photographing the occupants of the clubhouse

actually furthered this purpose.   While the plaintiffs allege that many complaints were

made about the tightness of the handcuffs applied during the search, the head-shot

pictures generally do not show anyone's wrists nor other complained-of areas of

injury.  Unlike a contemporaneous video recording of a police interaction with an

individual, which preserves, for both the police and the individual, an indisputable

recording of what may otherwise be a heated interaction likely to result in differing

accounts of what occurred,[13]  the pictures here do not have any "protective" qualities

except to the extent they may demonstrate that the occupants did not suffer any

external trauma to the front of their head or their upper body clothing.  Thus, it cannot

be determined on summary judgment that the photographs furthered, or were taken in

furtherance of, this stated objective.

It is also far from apparent that the first stated objective– "to preserve for

investigative purposes a record of the individuals present at the Christmas party"-- is a

legitimate governmental objective under the Fourth Amendment.  While the

defendants had the authority to ask the occupants for identification, Meuhler v. Mena,

125 S.Ct. 1465, 1471 (2005),  under the scope of the search warrant, the defendants

did not have the authority to conduct searches, beyond those necessary for security

purposes, of all of the people present at the OMC clubhouse during their search, nor

did the mere presence of the party guests at the OMC clubhouse confer such

--------

[13]The court notes that had the defendants, in their preparation for the execution
of the search warrant, made sure to have a working video camera on hand, many of the
allegations and disputes of fact in this lawsuit would have been easily resolved.

authority upon the defendants.  Generally,

> a person's mere propinquity to others independently suspected of
> criminal activity does not, without more, give rise to probable cause to
> search that person. . . . This requirement cannot be undercut or avoided
> by simply pointing to the fact that coincidentally there exists probable
> cause to search or seize another or to search the premises where the
> person may happen to be.

 Ybarra v. Illinois, 444 U.S. 85, 91 (1979).  "Beyond [the] general authority to detain

persons and make limited security searches, however, there must be probable cause,

or at least some degree of particularized suspicion, to justify further searches or

seizures of individuals" present during the search of a premises but not named in a

warrant.  Rivera, 928 F.2d at 607.  The defendants have not stated or demonstrated a

showing of probable cause, or even a lesser showing of particularized suspicion

consonant with the degree to which the plaintiffs' privacy interest were invaded, with

respect to the plaintiffs or other occupants whose images they seized which would

necessarily entitle them to undertake these actions.  See Arizona v. Hicks, 480 U.S.

321(1986)(holding that probable cause is necessary to justify a search, consisting of

moving stereo equipment to observe its serial number, unrelated to the purpose of the

police's reasons for entering a private residence, where the objected search was not

apparently incriminating under the plain view doctrine); Davis v. Mississippi, 394 U.S.

721, 728 (1969)(detention for purposes of obtaining fingerprints is subject to Fourth

Amendment requirements); Brown v. Texas, 443 U.S. 47, 51-52 (1979)(finding that

the police could not stop someone and require that he identify himself merely

because he was in a neighborhood frequented by drug users); see also United States.

Johnson, 452 F.2d 1363, 1371 (D.C. Cir. 1971)(finding photographic seizure during

-38-

involuntary detention may be subject to Fourth Amendment).

It is reasonable, and the plaintiffs concede, that the police have the ability to document their search of a particular premises as it occurs so as to create a record of its actions and to protect against claims of property damage.  However, this documentation must relate to the scope of the warrant or some other legitimate governmental objective, and it cannot "take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Maryland v. Garrison, 480 U.S. 79, 84 (1987).  Circumstantial evidence in the record suggests that the defendants did not take the head shot pictures of the OMC party guests for the reasons stated by the defendants in their pleadings, but for other, prohibited purposes.  For example, the "after-action incident report" written by Sergeant Burgess states that "[b]efore and after photos and video were taken, as is procedure, in addition to numerous photos of intelligence value."  Defs' Rule 56(a)(1) Statement, Ex. 2, Tab. D.  While the subjective motivations of the defendants are not relevant to the Fourth Amendment reasonableness analysis, if the photographs, by their nature, and in the circumstances of the case, only furthered impermissible purposes and not legitimate ones, the purposes that the evidence demonstrates were served by the photography may be relevant to their reasonableness.  To the extent that the head shot photographs only furthered impermissible purposes, such as general investigation of people merely in the presence of suspected criminal activity not supported by particularized suspicion, and did not further a legitimate governmental interest as proffered by the defendants, they constitute unreasonable seizures under the Fourth Amendment.

Having determined that the plaintiffs, viewing the evidence in the light most favorable to them, have stated a claim for a constitutional violation, the court must determine whether the defendants are entitled to qualified immunity for taking the head-shot photographs.  The inquiry is whether it was objectively reasonable for the defendants to believe that their actions in photographing the plaintiffs did not violate any clearly established right of the plaintiffs, i.e., that their actions arguably satisfied the requirements of the Fourth Amendment.  This inquiry may be stated two different ways: 1) to what extent was it objectively reasonable for the defendants to believe that the photographs furthered a legitimate governmental objective?; and 2) to what extent was it reasonable for the defendants to believe that the objective identified by the plaintiffs as constitutionally impermissible, i.e., general investigation for intelligence gathering purposes, was a legitimate one that did not violate any clearly established rights of the plaintiffs?

The former inquiry is a mixed question of law and fact that, given the material facts in dispute, cannot be resolved on summary judgment.  See Kerman II, 374 F.3d at 109 ("[W]hether a reasonable officer would reasonably believe that his conduct did not violate a clearly established right, is a mixed question of law and fact.").

The latter inquiry requires the determination of whether the constitutional right in question was clearly established at the time of the defendants' actions. "[A] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " Luna v. Pico 356 F.3d 481, 490 (2d Cir. 2004).  "The question is 'what a reasonable person

in the defendant's position should know about the constitutionality of the conduct.'" Id.

(quoting McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir.

1999)).   Here, the court concludes that no reasonable officer could reasonably

believe that it was constitutionally permissible to take head shot photographs of every

guest at the OMC clubhouse who were merely present for a Christmas party at the

time the police executed a warrant to search for evidence relating to possible firearms

violations by Frank Nelson.   Caldarola and Lauro established that the recording of

someone's image can constitute a seizure or invasion of privacy for Fourth

Amendment purposes that must be justified by legitimate government objectives.  See

Caldarola, 343 F.3d at 574; Lauro, 219 F.3d at 212.   Since Ybarra and Rivera, it has

also been clearly established law, and an essential principle guiding police activity,

that searches and seizures relating to detained occupants of a premises that is being

searched pursuant to a warrant must themselves be supported by "at least some

degree of particularized suspicion."  Rivera, 928 F.2d at 607; see also Ayeni v.

Mottola, 35 F.3d 680, 689 (2d Cir. 1994).   Thus, the court concludes, the defendants

are not entitled to qualified immunity on the basis that the law did not put the

defendants on notice that their alleged conduct was unlawful.  Saucier, 533 U.S. at

202.  Accordingly, the defendants' motion for summary judgment on the plaintiffs'

claims regarding the head-shot photographs is DENIED.

        2.        Photographs of the Clubhouse

      The plaintiffs also challenge the defendants' authority to take other

photographs of objects in the clubhouse during the course of their search, arguing

that particular pictures are not justified under the scope of the search warrant or by

another legitimate governmental purpose.[14]  The record demonstrates that the
defendants, in the course of the search authorized by the warrant relating to Frank
Nelson's firearms, took page-by-page photographs of the OMC chapter list, as well as
close-up photographs of shirts, pictures, and other OMC memorabilia displayed in the
clubhouse.  Pls' Rule 56(a)(2) Statement, Ex. 16 and 20.  The defendants have
suggested that the pictures of the clubhouse during the search were taken pursuant to
a standardized procedure of taking "before and after" pictures of a searched premises
so as to document the damage caused by the search.  See Def's Rule 56(a)(1)
Statement, Tab No. 2, Burgess Aff., Tab D (Sgt. Burgess's After Action Report), p. 2.

In Hicks, the Supreme Court found that a police officer's actions in moving
stereo equipment to reveal a serial number, in an apartment in which he was present
for unrelated reasons, constituted a search that must be independently supported by
probable cause.  480 U.S. at 325-26.  Similarly, the page-by-page examination and
recording of the OMC chapter list, after a defendant ascertained that it was not itself
evidence of a firearms violation by Frank Nelson, or inherently incriminating under the
plain view doctrine, could constitute a warrantless search and seizure under Hicks.
Furthermore, as discussed in the preceding section, material issues of fact exist with
regards to whether the photographs of the memorabilia in the clubhouse were taken
pursuant to a procedure that furthered a legitimate governmental purpose or whether
they were taken in furtherance of an investigative purpose not sufficiently related to

---

[14]The court considers this claim to be on behalf of the OMC member plaintiffs, as
the non-member plaintiffs do not have "standing" under the Fourth Amendment to raise
claims regarding the property of the OMC.

the objectives of the search warrant.  Accordingly, summary judgment on the plaintiffs'

claims regarding the pictures of the OMC chapter list and memorabilia is DENIED.

3.      Search of Incidental Belongings

Barbara Warren stated in her affidavit that, in addition to being patted down for

weapons, a defendant searched through her purse, and she observed the defendants

searching through other women's pocketbooks.  Pls' Rule 56(a)(2) Statement, B.

Warren Aff., ¶ 9.  These searches were justified as a reasonably self-protective,

limited search for weapons, especially in light of the nature of the firearms offenses in

question and the circumstances of the overall search.  See Rivera, 928 F.2d at 606

(citing United States v. Barlin, 686 F.2d 81, 87 (2d Cir. 1982)).  Thus, summary

judgment in favor of the defendants is GRANTED regarding Barbara Warren's purse.

4.      Opening of Wrapped Christmas Presents

Several of the plaintiffs have stated that, in the course of their search, the

defendants opened wrapped Christmas presents that belonged to the plaintiffs.  In

particular, Marty Warren stated that a wrapped picture frame belonging to him was

opened, and Allison Piscottano stated that handmade gifts, wrapped in handmade

wrapping paper, she had brought to the party were opened and the wrapping paper

unnecessarily ripped.  Pl's Rule 56(a)(2) Statement, M. Warren Aff., ¶ 22; A.

Piscottano Aff., ¶ 19.  Phil LaBonte and Kelly Hemmeler also stated that they

observed Christmas gifts that had been opened by the state police, and Kelly

Hemmeler stated that the Christmas presents did not contain concealed weapons or

other evidence.  Id., K. Hemmeler Aff., ¶ 18; LaBonte Aff., ¶ 12.

The search warrant authorized the defendants to search the OMC clubhouse

for evidence of certain firearms violations related to Frank Nelson, including

ammunition and  "documents, paperwork, forms, receipts, and/or bills of sale

regarding and related to the purchase, possession, receipt, ownership, transfer,

delivery, and/or sale of handguns or assault weapons."[15]  Pls' Rule 56(a)(1)

Statement, Ex. 1.  Such evidence could conceivably be concealed within wrapped

Christmas presents, and, therefore, the opening of the Christmas gifts is reasonably

related to the objectives of the search warrant.  See United States v. Ross, 456 U.S.

798, 820-21 (1982)("A lawful search of fixed premises generally extends to the entire

area in which the object of the search may be found and is not limited by the

possibility that separate acts of entry or opening may be required to complete the

search.  Thus a warrant that authorizes an officer to search a home for illegal

weapons also provides authority to open closets, chests, drawers, and containers in

which the weapon might be found."); Dalia v. United States, 441 U.S. 238, 258

(1979)("[O]fficers executing search warrants on occasion must damage property in

order to perform their duty."). Accordingly, summary judgment in favor of the

defendants on the plaintiffs' claims concerning the opened Christmas gifts is

GRANTED.

5.      Seizure of Marty Warren's Address Book

———————————————————

[15]While the court has found that the search warrant affidavit provides probable
cause to search the clubhouse for firearms in Frank Nelson's possession, it does not
believe that the search warrant affidavit provides a sufficient basis to believe that
Nelson may have stored documents from the transfer of firearms, which he acquired
before 1994, in the clubhouse, which has only existed since 2002.  However, because
the warrant was sufficiently supported by probable cause in other respects, and
because the search for "ammunition" would reasonably involve searching the same
places that may hold a "document," this finding does not impact the court's ruling.

In his affidavit, Marty Warren states that Sergeants Burgess and Garbedian brought him into a back room during the course of the search and made him empty the content of his pockets, which included his address book.  Pls' Rule 56(a)(2) Statement, M. Warren Aff., ¶ 24.  He states that one of them took his address book and put it on the couch, and that, while his other personal effects were returned to him, his address book was never returned.  Id.  The plaintiffs argue that this is evidence of an unreasonable seizure under the Fourth Amendment.[16]  See Brower v. County of Inyo, 489 U.S. 593, 596 (1989)("Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking.")

Seizure of Marty Warren's address book would clearly be beyond the scope of the search authorized by the warrant, and no objectively reasonable officer could believe that seizure of the address book was supported by the scope of the warrant. The defendants argue that  the evidence does not demonstrate that the defendants actually left with the address book, nor that they are currently in possession of it. Rather, they argue, the evidence only suggests that the address book was negligently disposed of and thus cannot support a claim of unconstitutional seizure.  However, in Warren's account of his personal search, the defendants acquired control over the address book when they told Warren to empty his pockets.  Given that the defendants were the last people in control of the address book, the plaintiffs have presented

---

[16]It would also appear that the search of Marty Warren's pockets itself may be unreasonable under the Fourth Amendment if it was beyond that necessary for a protective safety search.

circumstantial evidence that supports the reasonable inference that the defendants seized the address book.  Accordingly, the defendants' motion for summary judgment regarding the seizure of Marty Warren's address book is DENIED.

6.     Searches of Cars in OMC Compound

Marty Warren, Phil LaBonte Jr., and Kelly Hemmeler all state that they had to submit to full searches of their vehicles before they were allowed to leave the OMC premises.  Id., M. Warren Aff., ¶ 23; LaBonte Aff., ¶ 16; K. Hemmeler Aff., ¶ 17. While the automobiles searches were not addressed by either party in the summary judgment pleadings, at oral argument the plaintiffs made clear that they intended to assert claims under the Fourth Amendment regarding these searches.

At oral argument, the defendants suggested that the automobile searches were authorized by the terms of the warrant, which permitted the search of "any garages, trash containers, storage sheds, the surrounding grounds, and any other structure or building(s) owned, operated, used or utilized in conjunct with the second floor of the building located at 27 Division Street, in Waterbury, CT."  Pls' Rule 56(a)(1) Statement, Ex. 1, p. 9.

While the issue has not apparently been addressed by the Second Circuit, several other Courts of Appeals have held that a search warrant authorizing the search of a premises and its surrounding grounds also authorizes the search of vehicles located on those grounds.  See United States v. Patterson, 278 F.3d 315, 318 (4th Cir. 2002)("Where a warrant authorizes the search of an entire property or premises, the scope of the warrant includes automobiles on the property or premises that are owned by or are under the dominion and control of the premises ower or

-46-

which reasonably appear to be so controlled."); <u>United States v. Evans</u>, 92 F.3d 540,

543-44 (7th Cir. 1996)("It seems to us that a car parked in a garage is just another

interior container, like a closet or a desk"); <u>United States v. Walker</u>, 922 F.Supp. 732,

754 (N.D.N.Y. 1996) (citing cases from the 5th, 1st, and 8th circuits); <u>see also</u> Wayne

R. LaFave, 2 <u>Search and Seizure</u> § 4.10c (2005)("It has often been held that a search

warrant authorizing the search of certain premises covers automobiles found on those

premises.").  Several courts have also recognized some limits on the extent to which

cars not owned by the owner of the searched premises may be search.  <u>See</u> <u>Evans</u>,

92 F.3d at 544 (search of car authorized by warrant unless the car "obviously

belonged to someone wholly uninvolved in the criminal activities going on in the

house."); <u>United States v. Gottschalk</u>, 915 F.2d 1459, 1461 (10th Cir. 1990)

(authorizing search of vehicles that appear, based on objectively reasonable indicia

present at the time of the search, to be controlled by, or under the dominion of, the

owner of the premises in question); <u>Walker</u>, 922 F.Supp. at 754-55 (finding search of

car within scope of warrant because it was reasonable under the circumstances to

conclude that the object of the search may be in the car); LaFave, 2 <u>Search and</u>

<u>Seizure</u> § 4.10c (2005)("[T]he conclusion that a description of premises covers

vehicles parked thereon should at least be limited to vehicles under the control (actual

or apparent) of the person whose premises are described. . . . [A] warrant for a certain

house does not cover the automobile of a visitor there who has parked his car in the

driveway.").

    Here, ownership of the premises in question does not provide a useful

distinction; it is more helpful to determine whether evidence at the time of the search

indicated that the cars were apparently under the control of people connected to the criminal activity that was the subject of the state police investigation, i.e., Frank Nelson's illegal possession of firearms.  Because the evidence set forth in the warrant affidavit suggested that Frank Nelson may be in possession of firearms for the purpose of "protecting" the Waterbury OMC, the searches of OMC member cars (Warren and LaBonte) were reasonably within the scope of the warrant.  It is not clear that the same could be said of Hemmeler's car.  The evidence indicates that, at the time her car was searched, the police would likely have ascertained that she was merely a guest at the Christmas party, and unlikely to be connected to any "protection scheme" involving firearms.  Hemmeler's mere presence at the OMC clubhouse would not, without more, make it likely that evidence of Frank Nelson's possible firearms violations would be found in her car.

Nonetheless, because reasonable officers could reasonably, albeit mistakenly, believe that the scope of their warrant extended to the cars of non-OMC members that were on the OMC premises, the defendants are entitled to qualified immunity on the plaintiffs' claims regarding the searches of their cars.  In addition, it is not clearly established law in the Second Circuit that all cars on the premises that is the subject of a search warrant cannot be searched.  Summary judgment in favor of the defendants on these claims is therefore GRANTED.

### D.    Particular Uses of Force

As with their claims regarding the reasonableness of particular searches and seizures, the plaintiffs urge the court to consider their claims regarding the defendants' use of force from the perspective of the totality of the circumstances and

not by merely isolating particular examples of the defendants' conduct and

determining whether they, considered alone, support an excessive force claim.

Interestingly, the defendants also counsel the court to be mindful of the totality of the

facts and circumstances confronting the defendants in executing the search warrant.

Both parties cite to United States v. Banks, 540 U.S. 31 (2003), in which the Supreme

Court emphasized the totality of the circumstances approach, noting that:

> The Fourth Amendment says nothing specific about formalities in
> exercising a warrant's authorization . . . . Although the notion of
> reasonable execution must therefore be fleshed out, we have done that
> case by case, largely avoiding categories and protocols for searches.
> Instead, we have treated reasonableness as a function of the facts of
> cases so various that no template is likely to produce sounder results
> than examining the totality of circumstances in a given case; it is too
> hard to invent categories without giving short shrift to details that turn out
> to be important in a given instance, and without inflating marginal ones. .
> . . We have, however, pointed out factual considerations of unusual,
> albeit not dispositive, significance.

Id. at 35-36.  Nonetheless, some distinctions must be made regarding the categories

and qualities of the claims that the plaintiffs assert in order to meaningfully determine

whether they have demonstrated the existence of genuine issues of material fact

regarding the reasonableness of the defendants' actions, as well as whether the

defendants are entitled to qualified immunity from the plaintiffs' claims.

Accordingly, the court will consider, in order: 1) the plan and manner of the

defendants' initial entry into, and securing of, the OMC clubhouse; 2) property

damage occurring during the defendants' search activities; 3) the fact of detention,

and the length of the detention, of the plaintiffs; and 5) the allegations of particular

uses of force against, and alleged non-responsiveness to the injuries of, particular

plaintiffs.

All of these claims are analyzed under the general rubric of excessive force.   A person, even if lawfully detained, has a constitutional right to be free from the use of excessive force.  Graham v. Connor, 490 U.S. 386, 394 (1989).  On the other hand, a police officer is entitled to use such force as is reasonable in light of the circumstances and dangers facing him at the time of the encounter with a citizen.  Id. at 396.  The police officer may use physical force upon another person when and to the extent it is reasonably necessary to effect a seizure.  Id.

The reasonableness inquiry is an objective balancing, given the totality of the circumstances, of "the nature and quality of the intrusion on an individual's Fourth Amendment interest against countervailing governmental interests at stake."  Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)) (internal quotations omitted).  Factors to consider are the severity of the crime at issue, whether a suspect poses an immediate threat to the safety of the officers or others, and whether a suspect resists arrests.  Id.   "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id.  Officers are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving, about the appropriate steps, including the amount of force, that are necessary in a particular situation.  Id. at 397.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  Id

As discussed above, if an "officer's mistake as to what the law requires is reasonable . . . the officer is entitled" to qualified immunity on summary judgment. Saucier, 533 U.S. at 206.  However, summary judgment is not available where

material issues of fact exist with regards to both the underlying constitutional violation

and the availability of the immunity defense.  Kerman II, 374 F.3d at109.

> 1.     The Planning and Manner of the Entry into the Clubhouse

Much of the parties' pleadings and factual evidence regarding the plaintiffs'

excessive force claims relate to the decision by the defendants to employ the Tactical

Team in entering the OMC clubhouse and the specific conduct of the defendants in

their initial entry into the clubhouse.  Consistent with the approach of other courts that

have confronted the question of whether the decision by law enforcement to use a

SWAT team was itself excessive, the court will consider separately the decision to

use such force and the manner in which such force was allegedly used in evaluating

the plaintiffs' claims.  See e.g., Smith v. Marasco, 318 F.3d 497, 517 (3d Cir. 2003);

Holland v. Overdorff, 268 F.3d 1179, 1191 (10th Cir. 2001).

> A)     Decision to Use Tactical Team

After reviewing the sparse case law on the subject, including the district court

cases cited by the defendants here in support of their position that the decision itself

by law enforcement to use "dynamic entry" (i.e., a "SWAT team") is not properly

analyzed under the Fourth Amendment, the Tenth Circuit in Holland determined that

such a decision does fall under Fourth Amendment scrutiny.  269 F.3d at 1190

(finding "decision to use a SWAT team to make a 'dynamic entry' into a residence

constitutes conduct immediately connected with the seizure because it determines the

degree of force initially to be applied in effecting the seizure itself.");  The court in

Holland ultimately found that, while the specific conduct of the SWAT team in that

case gave rise to excessive force claims, the decision to use the SWAT team was not

itself excessive as the defendants did not "lack[] any plausible basis for believing that dynamic entry was warranted in [the] situation." Id. at 1191. In Marasco, the Third Circuit also analyzed whether the decision to activate a Tactical Team was objectively reasonable under the Fourth Amendment. 318 F.3d at 517. The Marasco court found that the question of the reasonableness of the decision should go to the jury because the plaintiff had proffered sufficient evidence regarding the severity of the threat faced by the defendants to call into question the reasonableness of their actions. Id. at 516-17.

Here, the defendants argue that the decision to use the Tactical Team was objectively reasonable because of the information known to the state police regarding the Outlaw's propensity for violence. In support of this position, the defendants point to the incidents of violence involving the OMC that had occurred in Connecticut, which were recounted in the affidavits of Sergeant Burgess and Master Sergeant Lewis.

In challenging the decision to use the Tactical Team, and, generally, in pressing their excessive force claims, the plaintiffs call into question the reasonableness of the defendants' assessment of the threat posed by the Waterbury OMC. The plaintiffs argue that it is unreasonable to ascribe to the Waterbury OMC the reputation for violence and lawlessness that has been associated with the OMC in various law enforcement reports, especially in light of the deposition testimony of Sergeant Gary Pelosi of the Waterbury Police Station, who testified that, although he was aware of reports of violent incidents between rival motorcycle clubs in other places, he was not aware of any similar incidents in Waterbury. Pls' Rule 56(a)(1) Statement, Ex. 39, ¶. 53-55. The plaintiffs also cite, in support of their position, a

"Risk Assessment Survey" prepared by the Connecticut State Police which is intended to aid the state police, through the assignment of points based on various facts and circumstances, in the decision to employ the Tactical Team in executing a search warrant.  Id., Ex. 15.  According to the plaintiffs, if completed according to the circumstances of the case, the Risk Assessment Survey would not recommend the use of the Tactical Team.[17]

The defendants have submitted, in support of their arguments, a expert witness report prepared by Sergeant Thomas Higginbotham of the Massachusetts State Police.  The report largely consists of information about the Outlaws nationally, which is gathered from a variety of sources, summaries of the police's efforts in surveiling the Outlaws and other motorcycle clubs in New England, and particular incidences of violence involving members of the Outlaws that have occurred in New England.  Based on this information, Sergeant Higginbotham concludes that:

> Based on my training and experience, coupled with my interaction with this outlaw motorcycle clubs in Massachusetts and the surrounding states as a law enforcement officer, it is my opinion and belief that the Outlaws have, and continue to be a violent organization that exhibits similar traits as found with traditional organized crime "gangs" . . . . In my

---

[17] The defendants argue that the Risk Assessment Survey, and police procedure in general, is not relevant to the question of whether constitutional violations occurred because they are not necessarily intended solely to determine what is reasonable but may also be informed by other considerations, such as good public relations.  The court agrees that the Risk Assessment Survey, and other procedures cited by the plaintiffs, are not dispositive on the question of whether the defendants used objectively reasonable force under the circumstances, but it also finds that the Survey and procedures are relevant to the determination of whether it was reasonable for the defendants to believe that their actions were reasonable in the circumstances and within the law.  While the defendants may be correct in arguing that the plaintiffs are not appropriately trained to determine the correct score on the Risk Assessment Survey, this argument goes to the weight of the evidence and not its admissibility or relevance.

> opinion, under only the most exigent of circumstances would law enforcement officers be advised to serve an arrest warrant or search warrant at one of the Outlaw's clubhouses without the use of substantial law enforcement and backup, including the use of a tactically trained and equipped teams of officers, if available.  If for no other reason, should violence erupt, law enforcement officers can expect members and associates of the Outlaws to be heavily armed.

Defs' Rule 56(a)(1) Statement, Higginbotham Report, pp. 94-95.  The report later

states:

> Once on the premises, extreme caution is always warranted when dealing with the Outlaws and their associates.  Such measures as handcuffing all present for the safety of the officers involved, checking them for wants and warrants, patting them down for weapons and contraband, and photographing them to avoid false claims of brutality, as well as to assist in establishing the identity of the individuals present should any questions arise are, in my opinion, quite common and are absolutely essential to a well organized and executed law enforcement operation involving the Outlaws.  Having reviewed the execution of the search warrant at the Outlaws' clubhouse in Waterbury, Connecticut on December 20, 2003, it is my opinion that this operation was professionally planned and executed in a manner consistent with common law enforcement practice when dealing with outlaw motorcycle gangs.

Id., p. 94.

The plaintiffs have moved in limine to exclude Higginbotham's report and

opinion under Fed.R.Evid. 702 and Daubert v. Merrell Dow Pharmeceuticals, Inc., 509

U.S. 579, 588 (1993).  The court evaluates expert testimony under Rule 702 of the

Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In Daubert, the Supreme Court held that Rule 702 assigns district courts "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597; see also Nimely v. City of New York , 414 F.3d 381, 396 (2d Cir. 2005).  In Daubert, the Supreme Court set out a list of non-exclusive factors that trial courts may consider in determining whether an expert's reasoning and methodology are reliable: (1) whether the theory or technique on which the expert relies has been or could be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has been generally accepted in the scientific community. Daubert, 509 U.S. at 593-94; see also Nimely, 414 F.3d at 396.

The test of reliability is a "flexible" one depending on the "nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony" and no one factor will necessarily be determinative of the reliability of an expert's testimony, because the district court need only "consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 152, see also Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265-66 (2d Cir.2002).  While "Rule 702 embodies a liberal standard of admissibility for expert opinions," Nimely, 414 F.3d at 396, "reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between [an expert's] methodology and the expert's conclusions."  Id. "Nothing in either Daubert or the Federal Rules of Evidence requires a district court to

admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."  Id.

The plaintiffs have moved in limine to exclude Sergeant Higgonbotham's report, arguing, inter alia, that it undertakes to tell the jury what result to reach, and that its conclusions are not based on reliable data, principles, or methods.  The defendants argue that the report is relevant to the reasonableness of the defendants' actions by assisting the "trier of act in understanding the many arcane law enforcement considerations which inform the methodology by which gang investigations are conducted." Def's Memo. of Law in Opp. to the Pls' Mot. in Limine, p. 8 [Doc. No. 124].  The defendants also argue that Sergeant Higginbotham's conclusions are reliable in light of his twenty-seven years of police experience dealing with motorcycle gangs in New England.

The court finds that the Sergeant Higgonbotham's report should be excluded with respect to the conclusions it contains regarding the "essential" and "common" nature of the police practices used by the defendants in executing the search warrant. Sergeant Higgonbotham does not explicate any principles or methodology, besides alluding to his training and experience, in determining how his conclusions regarding the "essential" nature of the particular police practices employed by the defendants follow from the data that he has presented.  Nor does the data itself, which largely consists of information regarding activities of the Outlaws, or Sergeant Higgonbotham's experience in dealing with motorcycle gangs, provide a particular basis for reaching any conclusions regarding how "common" or "essential" the police practices used by the defendants are.  The court notes that Sergeant Higgonbotham

-56-

has only once personally participated in a raid on the clubhouse of a motorcycle club. Pls' Mot. in Limine, Higgonbotham Depo., p. 24.  Unlike the police expert's testimony in United States v. Hankey, 203 F.3d 1160 (9th Cir. 2000), which the defendants cite for support, Sergeant Higginbotham's opinion does not merely describe the patterns and practices of gang members— an opinion which would reasonably be informed by years of experience in dealing with particular gangs—but instead states conclusions about the proper patterns and practices of law enforcement in executing a warrant. Because Sergeant Higginbotham's report does not provide a factual or methodologically sound basis for the conclusions that he states, it is properly excluded under Rule 702.  See Nimely, 414 F.3d 381, 396 ("[W]here an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

However, Sergeant Higginbotham's descriptions and conclusions regarding the practices, structure, and violent propensities of the Outlaws in general is admissible under Rule 702.  While not scientific, Sergeant Higgonbotham's experience with, and knowledge of, the history and culture of the OMC and other motorcycle clubs in New England provides a basis for his conclusions, and it conforms to the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152 (1999).  In the criminal context, the Second Circuit has consistently upheld expert testimony regarding the structure, functions, and activities of organized crime. See United States v. Gotti, No. S8 02 CR 743(RCC), 2004 WL 2423799, at *2 (S.D.N.Y. Oct. 29, 2004)(citing United States v. Amuso, 21 F.3d 1251,

1263-64 (2d Cir.1994); <u>United States v. Locascio</u>, 6 F.3d 924, 936 (2d Cir.1993);

<u>United States v. Tutino</u>, 883 F.2d 1125, 1134 (2d Cir.1989); <u>United States v. Daly</u>,

842 F.2d 1380, 1388 (2d Cir.1988).   The Second Circuit has also upheld expert

testimony by law enforcement officers describing the characteristics and operating

methods of narcotics dealers.   <u>United States v. Cruz</u>, 363 F.3d 188, 193 (2004).   In

this regard, Sergeant Higgonbotham's report fulfills the reliability requirement of Rule

702, and it is relevant to the issue of whether it was reasonable for the defendants to

consider the Waterbury OMC to be a violent organization, and, thus, whether it was

reasonable for the defendants to execute the search warrant in the manner that they

did.   Accordingly, the plaintiffs' motion in limine is GRANTED in part and DENIED in

part.

Nonetheless, given the evidence regarding Sergeant Pelosi's observations and

the Risk Assessment Survey, the plaintiffs have produced sufficient evidence to

demonstrate the existence of a material issue of fact regarding the reasonableness of

the defendants' assessment of the threat posed by the Waterbury OMC in executing

the search warrant.   Cf. <u>Piscottano v. Murphy</u>, 317 F.Supp.2d 97, 102 (D.Conn.

2004)(finding that a factual issue existed as to "whether the Outlaws group in

Connecticut– as opposed to the national or international Outlaws group– poses any

threat or danger to the public . . . .").   Accordingly, it cannot be accepted as

undisputed fact that the Waterbury OMC possessed the violent characteristics, and

presented the danger to the public and the defendants, that the defendants claim.

A reasonable jury could not find, however, that the mere decision by the

defendants to employ the Tactical Team in executing the search warrant at the OMC

clubhouse was not objectively reasonable.   Given the nature of the violations that were the basis of the search warrant, and the voluntary association of the Waterbury OMC with the national OMC, it cannot be said that the decision to use the Tactical Team was excessive, or that the defendants "lacked any plausible basis" for believing that its use was reasonable.  See Holland, 268 F.3d at 1191; see also Dalia v. United States, 441 U.S. 238, 257 (1979)("[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant.").  Accordingly, summary judgment is GRANTED to the defendants on the plaintiffs' claim that the decision to employ the Tactical Team was itself excessive.

B)      Manner of Execution

As the courts in Holland and Marasco made clear, the decision to employ dynamic entry in executing a search warrant does not exempt law enforcement from Fourth Amendment standards of reasonableness concerning the manner in which the dynamic entry is carried out.

> The SWAT designation does not grant license to law enforcement officers to abuse suspects or bystanders, or to vent in an unprofessional manner their own pent-up aggression, personal frustration, or animosity towards others.  If anything, the special circumstances and greater risks that warrant 'dynamic entry' by a SWAT team call for more discipline, control, mindfulness, and restraint on the part of law enforcement, not less."

Holland, 268 F.3d at 1194; see also Marasco, 318 F.3d at 517-18 (quoting Holland).

Here, several historical factual disputes exist with regards to the use of force by the defendants in executing their initial entry into the OMC clubhouse.  The parties dispute whether a party guest "fled" the parking lot to warn the occupants of the

clubhouse of the state police's arrival; whether the defendants "knocked and announced" their arrival; whether the defendants wore clothing that hid their faces and whether their clothing identified them as state police; whether the defendants pointed their guns at the heads and chests of the occupants of the clubhouse after the plaintiffs were subdued; whether the defendants used profanity in ordering the occupants to comply with their directives; whether police dogs were present inside the clubhouse when the occupants were detained on the floor; and whether the police used force in retaliation against people who initially resisted the defendants' actions. These factual disputes are material as to the determination of whether the defendants' actions were objectively reasonable under the circumstances.  In addition, other facts bear on the reasonableness of the defendants' entry into the OMC clubhouse, such as whether the defendants were aware, at the time of their entry, that many more people were present in the OMC clubhouse than were contemplated in the action plan developed by Sergeant Burgess, and whether the presence of all of the party guests made the entry into the clubhouse at the particular time it occurred unreasonably dangerous, given the purpose, and non-time sensitive nature, of the search warrant.

Due to the disputed nature of these facts, the court cannot conclude whether, considering the totality of the circumstances, including the threat to safety reasonably anticipated by the defendants, and the objectives of the warrant that authorized the entry into the clubhouse, the plaintiffs were subject to an excessive use of force.  If the plaintiffs' account of the defendants' entry into the clubhouse is credited, and the occupants of the clubhouse were compliant with the directives of the defendants upon

their entry, then a jury could find the use of force in the manner claimed by the plaintiffs was unreasonable.

Several aspects of the manner of the defendants' entry into the clubhouse deserve specific discussion.  See Holland, 268 F.3d at 1192-95 (discussing separately the pointing of guns of children, failure to  "knock and announce," and use of harsh words, in "totality of the circumstances" approach to Fourth Amendment excessive force inquiry).

<u>                              i.      Timing</u>

The timing of the defendants' entry into the clubhouse may be considered unreasonable if  the defendants knowingly subjected many more people to the application of force and detention by the defendants than was reasonably necessary to carry out the objectives of the search warrant.  See Conn v. Gabbert, 526 U.S. 293 (1999)(noting that a challenge to the unreasonable timing of the execution of a search warrant could be brought under Graham); United States  ex rel. Boyance v. Myers, 398 F.2d 896, 897 (3d Cir.1968)("The time of a police search of an occupied family home may be a significant factor in determining whether, in a Fourth Amendment sense, the search is 'unreasonable.'")(cited approvingly in LaFave, 2 Search and Seizure § 4.7(b) (2005)).  The evidence in the record regarding the defendants' investigations into the activities of the OMC suggests that the defendants may have intended for the execution of their warrant to serve purposes beyond those stated in the search warrant.  Under the Fourth Amendment, such subjective motivations are irrelevant, and the only inquiry is whether the law enforcement officers' actions were objectively supported by the circumstances.  See Scott v. United States, 436 U.S.

128, 137 (1978).

Here, the circumstances of the defendants' entry into the OMC clubhouse must be viewed in light of the objectives of the search warrant authorizing their entry. Notably, the search warrant was for firearms and evidence of firearms violations which may have been stored at the clubhouse by Frank Nelson, and it did not authorize the search, nor provide probable cause for the search, of anyone present at the clubhouse besides Frank Nelson. To the extent that the warrant could have been executed at a time that would have effectively furthered the objectives of the warrant while subjecting many fewer people, including the defendants, to the dangers associated with the dynamic entry into a space occupied by 41 individuals, a jury could find that the timing of the execution of the warrant was unreasonable. Relevant to this question, of course, is whether the defendants knew the number of people present at the time of their entry into the clubhouse. The plaintiffs argue that the defendants knew, or should have known this fact, due to their surveillance that night to verify that Frank Nelson had arrived at the party. See Defs' Rule 56(a)(1) Statement, ¶ 69.

### ii.    Knock and Announce

The defendants have conceded, for purposes of this motion, that they did not knock and announce their presence prior to their entry into the clubhouse, arguing that no such announcement was required by the exigencies of the circumstances. In United States v. Banks, 540 U.S. 31 (2003), the Supreme Court reiterated that the "common law knock-and-announce principle is one focus of the reasonableness enquiry," and the general obligation to "knock and announce" gives way when "officers

have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or . . . would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Id. at 36.  The defendants argue that their belief that the occupants of the clubhouse could be armed and expected to respond with force to the entry of the defendants justified the lack of a "knock and announce" in these circumstances, as well as justified the damage caused by their entry to the front and rear doors of the clubhouse.

For the reasons discussed above, see supra p. 58-59, it is unclear that the defendants' beliefs about the dangers posed by the members of the Waterbury OMC were reasonable.  However, the defendants had, at least, "arguable" reasonable suspicion regarding their belief that exigent circumstances were present due to the dangerous nature of the occupants of the clubhouse.  Thus, the defendants are entitled to qualified immunity on the claim that their failure to "knock and announce" their presence was unreasonable.

iii.    <u>Use of Force</u>

If the plaintiffs' versions of events are credited, the display of firearms, the use of profanity, and the presence of police dogs in the clubhouse after the occupants of the clubhouse were subdued and detained could be found by a jury to have been excessive.  The defendants were undoubtedly entitled to make a display of force so as to quickly and effectively obtain control over the situation, and, by doing so, ensure the overall safety of the situation.  Muehler v. Mena, 544 U.S. at __, 125 S.Ct. at 1476 ("When officers undertake a dangerous assignment to execute a warrant to search

property that is presumably occupied by violence-prone gang members, it may well be appropriate to use both overwhelming force and surprise in order to secure the premises as promptly as possible.")(Stevens, J., concurring).  In addition, the court is cognizant that "[n]ot every push or shove, even if it may later seem unnecessary . . . violates the Fourth Amendment." Graham, 490 U.S. at 394.  According to the plaintiffs, however, the display of force by the defendants continued after everyone was handcuffed, and the plaintiffs continued, while handcuffed on the floor, to be subject to the threat of force posed by the defendants' weapons, as well as the fear caused by the presence of the police dogs and the threats of retaliation made by police.  A jury could find this force to have been unreasonably excessive.  See Holland, 268 F.3d at 1192 ("The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force.  Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time."); Baker v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995)(finding continued detention at gunpoint unreasonable where detained persons did not attempt to resist or interfere and nothing else justified the use of force).

"It is beyond dispute that the right to be free from excessive force has long been clearly established." Green v. Montgomery, 219 F.3d 52, 59 (2d Cir. 2000). While the defendants are entitled to qualified immunity if they made a reasonable mistake about the amount of force required by the situation, given the degree to which factual disputes exist regarding the type and amount of force used, as well as the circumstances surrounding the use of force, the court cannot conclude, on summary

-64-

judgment, that the defendants are entitled to qualified immunity.  See Kerman II, 374
F.3d at 109.  Accordingly, the defendants' motion for summary judgment regarding
the plaintiffs' excessive force claims pertaining to the period when the plaintiffs were
under the control of the Tactical Team is DENIED.

   2.  Property Damage Occurring During Search Activities

  In his affidavit, Marty Warren states that, during the course of the search of the
clubhouse, his compact discs were smashed, a glass case in the wall was "ripped
open" and booths were "pulled apart."  Pls' Rule 56(a)(1) Statement, Warren Aff., ¶
22.  Kelley Hemmeler also stated that the "glass case in the wall was ripped open,
shirts were pulled out and ripped open.  Booths were pulled apart . . . .  Three doors
were damaged, including the divider between the OMC and Righteous and Ruly
Clubhouses, an American Flag was torn down and ripped up, stereo wires were
yanked out and all of the food had to be thrown out."  Id., K. Hemmeler Aff., ¶ 18.

  As discussed above in relation to the search of the guests' Christmas presents,
the defendants were entitled to search any place and container in the clubhouse that
could contain the evidence sought by the warrant, and a certain amount of property
damage could be expected to occur in the course of the execution of a search
warrant.  Dalia, 441 U.S. at 258.  As with the claims regarding the opened Christmas
presents and the damage to the outer doors discussed above, Hemmeler's claim
regarding the spoiled food does not state a constitutional violation.  However, the
statements by the plaintiffs suggest that some property damage allegedly caused by
the defendants in the course of their search may have been excessive under the
circumstances, i.e., the damage was not reasonably necessary to effectuate the

search.  Accordingly, with the exception of the claims pertaining to the spoiled food and Christmas wrapping paper, the defendants' motion for summary judgment regarding the plaintiffs' claim of excessive force based on the property damage caused during the search of the premises is denied.

      3.      <u>Detention of Plaintiffs</u>

The plaintiffs assert claims under the Fourth Amendment challenging the fact that the plaintiffs were detained with handcuffs, as well as the length of their detention.  Generally speaking, police have a right to detain individuals with handcuffs found on a premises during the execution of a search warrant.  In <u>Meuhler</u>, the Supreme Court stated that "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure."  125 S.Ct. at 1470.  It also observed that "[t]he governmental interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises."  <u>Id.</u>  It found that the need to detain multiple occupants "made the use of handcuffs all the more reasonable."  <u>Id.</u> Regarding the length of detention, the Supreme Court also concluded that the two to three hour detention of four occupants that lasted for the duration of the search of a "gang house" for dangerous weapons was reasonable.  <u>Id.</u>

Considering the factors discussed by the Court in <u>Meuhler</u>, the court concludes that the mere fact that the plaintiffs were detained in handcuffs was not unreasonable in light of the circumstances of the execution of the search warrant.

Regarding the length of detention, however, the court reaches a different

conclusion.  Evidence in the record suggests that the length of the plaintiffs' detention in handcuffs was significantly prolonged by the defendants' insistence that each occupant of the clubhouse submit to a head-shot photograph before being released. A lawful seizure "can become unlawful if it is prolonged beyond the time reasonably required to complete [the lawful] mission."  Illinois v. Caballes, 543 U.S. 405; see also Meuhler, 125 S.Ct. at 1471-72 (discussing Caballes, finding that no "additional Fourth Amendment justification for inquiring about [the respondent]'s immigration status was required" where the questioning did not extend the time the respondent was detained).  While it was reasonable for the defendants to detain the plaintiffs and the other occupants of the clubhouse to maintain the safety of all present during the entry, it would not be reasonable, under the circumstances, for the detention of the plaintiffs to have been prolonged by the defendants' decision to photograph each occupant individually.  Under the action plan developed by Sergeant Burgess, the occupants of the clubhouse were to be released before the search occurred, so it was not necessary, unlike Meuhler, to detain the occupants for the duration of the search. Defs' Rule 56(a)(1) Statement, Griffin Aff., ¶ 21.   Under Graham, the invasion of liberty interests caused by continued detention in handcuffs, beyond the time necessary to safeguard law enforcement personnel for 1) the need to create "protective" photographs, or 2) the need to create a record for investigative purposes, would be excessive.[18]  Accordingly, to the extent that the length of any plaintiffs'

---

[18]   The court has already found that the desire to create a record for investigative purposes is an illegitimate government objective.  While creating a record for protective purposes may, in many instances, be a legitimate governmental objective, it would be unreasonable to prolong the invasion of someone's privacy interests through detention

detention was prolonged by the defendants' decision to take individual photographs of everyone present beyond what would have otherwise been necessary to secure the situation, the length of detention was unreasonable under the Fourth Amendment.

Both Caballes and Muehler, of course, were decided by the Supreme Court after the defendants' execution of the search warrant at the OMC clubhouse. However, it has been long established that the "legality of an investigatory stop depends on (1) the nature and extent of the government's need for the stop, which must be judged according to the importance of its law enforcement interests under the circumstances, and (2) the reasonableness of the stop, which depends mainly on the degree of police intrusion on the [detainees]'s freedom of movement." United States v. Pelusio, 725 F.2d 161, 165 (2d Cir. 1983); see also United States v. Barlin, 686 F.2d 81, 86 (2d Cir. 1982).  Here, material factual disputes exist concerning the length of the plaintiffs' detention in relation to the reasonable needs of the defendants under the circumstances in securing the clubhouse, and whether the detention was significantly prolonged due to the decision to take the individual photographs for purposes unrelated to the search warrant.  Accordingly, the court is unable to determine whether the defendants made a reasonable mistake as to the requirements of the law, and thus cannot determine whether the defendants are entitled to qualified immunity on summary judgment.

      4.     Injuries Suffered by Plaintiffs During, and Due to, Detention

The plaintiffs have also asserted claims regarding the injuries they allegedly

---

in handcuffs for a significant period of time so that a picture could be taken to help the police defend themselves against claims of abuse.

suffered due to their detention in handcuffs, as well as, in the case of Gary Piscottano, injuries suffered while detained in handcuffs. The defendants argue that none of the plaintiffs' claims regarding injuries from their detention rise to the level of a constitutional tort. Given the nature of the claims, the court will consider each plaintiff's claim individually to determine whether he or she has produced sufficient evidence to demonstrate the unreasonable use of force.

Claims of excessive force in the use of handcuffs are analyzed under the Graham objective reasonableness framework. The District Court in Esmont v. City of New York, 371 F.Supp.2d 202 (S.D.N.Y. 2005) synthesized well the factors relevant to the consideration of excessive force claims involving the application of handcuffs:

> It is well established that the right to make an arrest accompanies with it the right to use some degree of physical coercion. Graham, 490 U.S. at 396, 109 S.Ct. 1865. Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out. Cavazos v. Voorhies, 00-C-7929, 2002 WL 31017492, at *3 (N.D.Ill. Sept. 9, 2002). Placing handcuffs on an arrestee tight enough to cause nerve damage may, however, constitute excessive force in violation of the Fourth Amendment. See, e.g., Kopec v. Tate, 361 F.3d 772, 777 (3d Cir.2004); Lucky v. City of New York, 03 Civ.1983, 2004 WL 2088557, at *7 (S.D.N.Y. Sept. 20, 2004); Simpson v. Saroff, 741 F.Supp. 1073, 1078 (S.D.N.Y.1990). Contra Carter v. Morris, 164 F.3d 215, 219 n. 3 (4th Cir.1999) (claim based on tight handcuffing "is so insubstantial that it cannot as a matter of law" give rise to a Fourth Amendment violation). The reasonableness of the handcuffing of an arrestee must be determined in light of the minimal amount of force necessary to maintain custody . . . . See Santos v. Gates, 287 F.3d 846, 854 (9th Cir.2002). In addition, in evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists. See, e.g., Burchett, 310 F.3d at 944-45; Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir.2001) (plaintiff must show more than de minimis injury).

Id. at 214-15. In his concurrence in Meuhler, Justice Kennedy also observed that

"[t]he reasonableness calculation under <u>Graham</u> is in part a function of the expected and actual duration of the search.  If the search extends to the point when the handcuffs can cause real pain or serious discomfort, provision must be made to alter the conditions of detention at least long enough to attend to the needs of the detainee."  125 S.Ct at 1472 (Kennedy, J., concurring).

The court will consider each plaintiffs' claims with these factors in mind.  Given the disputed issue of fact that exist with regard to the events in question bearing on the reasonableness determination , the court cannot determine whether the defendants are entitled to qualified immunity.

### A)   Marty Warren

Marty Warren does not claim to have been injured by the application of handcuffs, nor through the application of force used in detaining him.

### B)   Barbara Warren

In her affidavit, Barbara Warren states that she was inside the clubhouse when the defendants entered.  Pls' Rule 56(a)(2) Statement, B. Warren Aff., ¶ 6.  She states that her hands were tied behind her back with a zip tie so tightly that moving her hands caused "sharp shooting pains" up her arms.  <u>Id.</u>   She also states that she experienced "great anguish" and "had to lay there for what seemed like hours."  <u>Id.</u>  She states that she heard many other people complaining about the tightness of their handcuffs, and she did not complain about the pain caused by the handcuffs because she was too afraid to say anything given the threat of force demonstrated by the defendants.  <u>Id.</u>

Crediting Warren's statements, the tightness of her handcuffs may have been

excessive.  There is no evidence that she appeared threatening to the defendants, nor that, despite the defendants' expectations of violent resistance before entering the clubhouse, there was any general resistance or non-compliance with the directives of the defendants.  While she did not complain personally about the tightness of her cuffs, her fear of complaining may have been reasonable in light of the situation she describes, in which the defendants continued to brandish their weapons at the detained occupants and the police dogs were present among the detained people on the floor.  The general complaints about the handcuffs could have reasonably put the defendants on notice that they should check and adjust the cuffs of the occupants once it was determined that there was no real threat of violence or resistance emanating from the detaining occupants.    Accordingly, a jury could find that the force used to detain Barbara Warren was excessive, and summary judgment is DENIED as to her claim.

>C)    Phil LaBonte, Jr.

In his affidavit, LaBonte states that he was cuffed behind his back with metal cuffs.  Pls' Rule 56(a)(2) Statement, LaBonte Aff., ¶ 8.   He also states that the cuffs hurt his shoulder and wrists, that he had difficulty breathing, and that he made complaints to "a number of people throughout the night" but no one responded to him. Id.  He complained to Sergeant Pelosi of the Waterbury Police, who responded that there was nothing he could do because "[i]t's not my show."  Id.  He also claims to have been handcuffed for one half to two hours.  Id.  LaBonte also states that he observed Gary Piscottano have his hair pulled and back stepped on by a defendant, and, when LaBonte looked over, the defendant said: "'If you look over I'll hit you with

my gun butt.'" Id. at ¶ 9.

Given LaBonte's statements that he made many complaints regarding the pain caused by his cuffs that were not responded to, and that there is no allegation that LaBonte resisted or threatened the state police during their execution of the warrant, a jury could find that the defendants' failure to examine and loosen his cuffs during his detention was unreasonably excessive.

      D)     Dominic Papsadore

Papsadore states that, when the defendants entered the clubhouse, he was sitting on a couch.  Pls' Rule 56(a)(2) Statement, Papsadore Aff., ¶ 5.  He was directed by a defendant to "get on the fucking floor."  Id.  Papsadore responded "No, I am a heart patient," slowly moved to the floor and was pushed down to the ground by the defendant.  Id.  When the defendant attempted to cuff Papsadore behind his back with flex-cuffs, Papsadore told the defendant that he had a torn rotator cuff.  Id. The defendant nevertheless cuffed him behind the back "tighter," while "screaming, 'Keep your head down, keep your fucking head down, don't fucking look at me!'"  Id. According to Papsadore, he was on the floor for 20-30 minutes while he repeatedly told the defendants of his heart condition.  Defs' Rule 56(a)(1) Statement, Papsadore Aff., p. 100.

Papsadore also states that, later during the course of the search, he complained about the tightness of his cuffs, and an officer who was presumably a member of the Search Team loosened his cuffs and put him on the couch.  Pls' Rule 56(a)(2) Statement, Papsadore Aff, ¶ 6.

Papsadore's claim presents a difficult question because the defendants'

authority to use force was undeniably at its peak during the initial entry into the clubhouse, and Papsadore's claim is largely predicated on this initial encounter. The court cannot conclude that the force initially used to detain Papsadore, while not politely employed, was unreasonable under the circumstances present during the initial entry. However, Papsadore also states that he made many complaints about his pre-existing medical conditions that were not tended to for a period of time that a jury could find to have been unreasonable, depending on how long the initial efforts to secure the clubhouse lasted, a fact which is in dispute. Particularly given his complaints about his pre-existing health conditions, a jury could find that the non-responsiveness to his complaints constituted excessive force.

### E)   Clifford Hemmeler

Clifford Hemmeler states that he was pushed down by the defendants, and that someone put their foot on his head while another person pulled his hands back while strapping his wrists "so tightly behind my back that my wrists and fingers went numb." Pls' Rule 56(a)(2) Statement, C. Hemmeler Aff., ¶ 6. In his deposition, Hemmeler acknowledges that the defendants "kind of helped me . . . down" and that he was not injured in the process. Defs' Rule 56(a)(1) Statement, C. Hemmeler Depo., p. 78. When Hemmeler tried to look for his wife, a defendant said to him, "[p]ut your fucking head down," and pressed Hemmeler into the floor forcefully with either his hand or foot. Pls' Rule 56(a)(2) Statement, C. Hemmeler Aff., ¶ 7. Hemmeler states that he was handcuffed for at least an hour, and that the defendants did not remove his cuffs after searching him. Id. at ¶ 8. He also states that he complained to the Search Team about the tightness of his cuffs but nothing was done to loosen them. Id. at ¶

11. He states that the cuffs left red marks on his wrists, the wrist bands were on so tight that they stopped the circulation in his hands, and his wrists hurt for days after the raid. Id. at ¶ 12.

As with LaBonte, the court cannot conclude that force initially used to detain Hemmeler was unreasonable under the circumstances. However, to the extent that Hemmeler complained about the pain in his hands and wrists after the situation was secure, and no one inspected his wrists or responded to his complaints, a jury could find that Hemmeler experienced an unreasonably excessive amount of force.

       F)   Kelly Hemmeler

Kelly Hemmeler states that, at the time of the defendants' entry into the OMC compound, she was in the parking lot with several non-plaintiffs. Pls' Rule 56(a)(2) Statement, K. Hemmeler Aff., ¶ 7. The defendants "yelled" at her to get down with her hands behind her back, and she was handcuffed on the ground. Id. at ¶ 8. She was made to lie face down on the icy ground for 20 minutes, and then made to sit outside at a picnic table for at least 20 minutes more, without a coat, and the defendants were not responsive to her complaints about being cold and the tightness of her cuffs, despite her shivering visibly. Id. at ¶¶ 9, 11. Hemmeler also states that, while she was on the ground, a defendant running by hit her in the head with a "tank attached to a circular saw," and, when she raised her head, she was kicked in the shoulder and told to get down. Id. at ¶ 9. Another defendant pointed a machine gun at her head. In addition, she was showered with sparks from the saw used to cut the lock off of the gate. Id. at ¶ 11.   She was eventually brought inside, and her handcuffs were eventually cut off with a small pocket knife. Id. at ¶ 14. The removal of the handcuffs

caused her pain because the flex-cuffs were twisted in a manner that cut into her wrists. Id. at ¶ 14. She later went to the Hartford Hospital Emergency Room to have her wrists examined, where she was told to take high doses of Advil for several weeks. Id. at ¶ 19. Her arms and wrists were sore for about two weeks. Id.

It does not appear that the initial force used to secure Hemmeler's compliance was excessive. However, the length of her detention outside could constitute excessive force given the wintery conditions. In Burchett v. Keifer, 310 F.3d 937 (6th Cir. 2002), the Sixth Circuit found that evidence that a suspect was left in a hot, unventilated car for three hours was sufficient to state a claim of excessive force. Id. at 945; see also Esmont, 371 F.Supp.2d at 214 (citing Burchett). Here, although Hemmeler was outside for a shorter period of time, given the seasonal temperature, a reasonable fact finder could that it was unreasonable to fail to move her to a warmer location, or provide a coat for warmth, when she was shivering.

The defendants have suggested that the contact Hemmeler may have experienced from the saw tank may have been negligent; at her deposition Hemmeler did testify that the contact appeared to be accidental or careless. Defs' Rule 56(a)(1) Statement, K.Hemmeler Depo., p. 51. However, given Hemmeler's position on the ground, drawing all inferences in her favor, the court cannot conclude that the hit to her head was not intentional. While being subject to the sparks from the saw would likely not, alone, support a claim for excessive force, considering the totality of the circumstances at the time, i.e., Hemmeler was detained in hand cuffs on the cold ground nearby, the exposure to sparks may be relevant to her excessive force claim. In addition, a jury could find the failure of the defendants to respond to her complaints

about the tightness of her handcuffs to be unreasonable in light of her injuries.

        G)    <u>Gary Piscottano</u>

      Gary Piscottano states that while he was lying face down in the clubhouse, someone kicked him and stepped on him in a manner that, he believes, was intentional.  Pls' Rule 56(a)(2) Statement, G. Piscottano Aff., ¶ 12.  When Piscottano raised his head to look toward the door, he made eye contact with Sergeant Palen, who then ran toward him.  <u>Id.</u>  He felt someone whom he believed to be Sergeant Palen step on his back, grab his hair, and pull his head back and to the side, while threatening Piscottano to move or say anything.  <u>Id.</u>  LaBonte also observed this incident.  LaBonte Aff., ¶ 9.  Piscottano was treated in the emergency room the following day for pain in his neck and shoulder.  G.Piscottano Aff., ¶ 18.  He was given pain medication and referred to an orthopedic doctor, who later prescribed a course of physical therapy.  <u>Id.</u> at ¶ 18.

      Given that Piscottano was detained with handcuffs and complaint at the time that the defendants allegedly stepped on him, kicked him, and yanked his head by his hair, a jury cold reasonably find that the force allegedly used on Piscottano while he was detained was excessive.  <u>See</u> <u>Robinson v. Via</u>, 821 F.2d 913, 923-24 (2d Cir. 1987)(finding that assertions that an officer "yanked" a plaintiff out of a car, and "twisted her arm behind her back," thereby causing bruises that lasted several weeks, was sufficient to state a claim for excessive force).

        H)    <u>Allison Piscottano</u>

      Allison Piscottano states that, when she was cuffed with flex-cuffs, her arms were "yanked repeatedly" behind her back, which caused her severe pain, and that

she was moaning, in obvious pain.  Pls' Rule 56(a)(2) Statement, A. Piscottano Aff., ¶

9.  She observed another occupant be "slammed . . . face down onto the floor,

causing his face to strike the floor with force and his glasses to fly off his face," after

the occupant made what Piscottano thought was a complaint to a defendant.  Id. at ¶

11.  Due to this incident, Piscottano was afraid to complain about the tightness of her

handcuffs.  Id. at ¶ 11.  She estimates that she was handcuffed for at least an hour

and a half.  Id. at ¶ 12.   She states that the defendants also caused her additional

pain when her cuffs were removed; when she protested that they were hurting her in

the process, the defendants "yanked" her arms up "even harder."  Id. at ¶ 14.  When

the cuffs were off, her hands and wrists were numb.  Id.

       The next day, Piscottano when to the Hartford Hospital emergency room due to

her hand and wrist pain.  Id. at ¶ 20.  She was prescribed pain medication, and she

eventually required surgery on both of her hands and right elbow due to her injuries.

She states that she is still in significant pain and suffers impairment as a result of the

injuries caused by the cuffing.

       Piscottano's allegations of serious injury clearly rise to the level of

unreasonable force.  Although she did not put the defendants on notice by explicitly

complaining about the pain caused by her cuffs, her "moaning" in pain should have

put the defendants on notice, and her fear of retribution for complaining was

reasonable in the circumstances.  Given the degree of injury suffered by Piscottano,

and the lack of evidence suggesting that she was non-compliant or threatening to the

defendants during her period of detention, a reasonable jury could find that the force

used to detain her was excessive.

**D.     The Individual Liability of the Defendants**

1.     Theories of Liability

To sum up the conclusions of the preceding parts, the court has found that the plaintiffs have produced evidence sufficient to state claims for unreasonable seizure regarding the photographs of the plaintiffs, photographs of the clubhouse unrelated to the purpose of the search warrant, the seizure of Marty Warren's address book, the excessive use of force experienced by the plaintiffs when they were detained, and individual claims of excessive force based on tight handcuffing and other physical interactions with the defendants during the plaintiffs' detention.  The question now becomes: which defendants are liable to which plaintiffs for what claims?

As in the preceding section, the court will discuss the several theories under which the defendants may be liable for the claims asserted by the plaintiffs, and then discuss the liability of the individual defendants in turn.

Personal involvement of a defendant is a prerequisite to an award of damages under section 1983.[19]  Crawford v. Coughlin, 43 F.Supp.2d 319, 323 (W.D.N.Y. 1999)(citing McKinnon v. Paterson, 568 F.2d 930, 934 (2d Cir. 1997)).  Personal involvement is a question of fact.  Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). A defendant may be personally involved in a constitutional deprivation if he directly participated in the infraction.  Id.   Here, the plaintiffs have identified, in several

---

[19] The plaintiffs have not produced any evidence of the Commissioner of Public Safety's personal involvement in the application for, and execution of, the search warrant.  At oral argument, the plaintiffs also noted that the Commissioner of Public Safety was only sued for the purpose of seeking prospective injunctive relief. Accordingly, the defendants' motion for summary judgment is GRANTED as to all claims against the Commissioner of Public Safety in his individual capacity.

instances, particular defendants that they assert are responsible for particular applications of unreasonable force and unreasonable search and seizure.

A defendant may also be personally involved in a constitutional deprivation if he failed to intercede to prevent a citizen's constitutional right from being violated. Police officers "have an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in their presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)(internal citations omitted). Whether an officer had a "realistic opportunity to intervene to prevent the harm from occurring" is a "question of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Id.  In evaluating a claim of failure to intervene, the court must look separately at different episodes of force that may, together, make up the plaintiffs' claim. O'Neill, 839 F.2d at 11.  Moreover, an officer cannot be held liable for failure to intercede unless such failure permitted fellow officers to violate someone's clearly established rights, and unless the failure to intercede occurred in circumstances in which it was "objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 129 (2d Cir. 1997).

In the instant case, the bases of liability that are discussed above can be

divided into several different general "episodes": the use of force by the Tactical Team in securing the clubhouse, the prolonged detention of the plaintiffs in handcuffs, the photographing of the individual plaintiffs, and the search of the clubhouse.  To the extent that the facts demonstrate that an individual defendant may have been present during one of these episodes such that he or she had "a realistic opportunity to intervene to prevent the harm from occurring," Anderson, 17 F.3d at 557, the defendant may be found liable for the claim or sets of claims in question.  For the reasons stated above, qualified immunity is either unavailable or incapable of being determined at the summary judgment stage for many of the plaintiffs' claims.

Supervisors may also be liable under section 1983 if their personal involvement in a constitutional deprivation can be established.  See Hayut v. State University of New York, 352 F.3d 733, 753 (2d Cir. 2003)("It is well settled . . . that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity."); Blyden v. Mancusi, 1986 F.3d 252, 264 (2d Cir. 1999).  The personal involvement of a supervisor can be established through:

> evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates.

Hayut, 352 F.3d at 753.  A plaintiff must also show an affirmative causal link between the supervisor's inaction and her injury.  Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002)/  The liability of the supervising officers involved in the execution of the search

warrant will be considered under this standard.

    2.   <u>Individual Defendants</u>[20]

        1)   <u>Richard Williams</u>

Detective Williams entered the clubhouse with the Search Team after the Tactical Team announced the premises were secure.  He was expected to assist in patting down occupants of the clubhouse for weapons and in identifying them.  Def's Rule 56(a)(1) Statement, ¶ 275.  He was also responsible for taking "before" and "after" photographs of the clubhouse, as well as to photograph any evidence located by others during the search.  <u>Id.</u> at ¶ 276.

The plaintiffs have come forward with sufficient evidence on which a reasonable jury could conclude that Detective Williams is liable to the extent he took pictures within the clubhouse that constituted seizures beyond the scope of the warrant.   A reasonable jury could also find Detective Williams liable for failing to intercede when, on the plaintiffs' version of events, he was present when the plaintiffs complained about the tightness of their handcuffs.  Similarly, a jury could find him liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the ground.  A jury could also find Detective Williams liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

        2)   <u>Richard Perron</u>

Detective Perron entered the clubhouse with the Search Team after the

---

[20] All references to the Defendants' 56(a)(1) Statement are admitted by the plaintiffs, unless otherwise noted.

Tactical Team announced the premises were secure.  Id. at ¶ 268.  He observed the occupants lying and kneeling on the floor in flex-cuffs.  Id. at ¶ 267.  He patted down occupants for weapons.  Id. at ¶ 268.  He claims, and the plaintiffs deny, that assisted in helping a heavy-set occupant who was in pain move from the floor to the couch to sit in a more comfortable position.  Id. at ¶ 269.  He participated in the search of the premises. Id. at ¶ 271.

The plaintiffs have come forward with sufficient evidence on which a reasonable jury could conclude that Detective Perron is liable to the extent he took pictures within the clubhouse that constituted seizures beyond the scope of the warrant.   A reasonable jury could also find Detective Perron liable for failing to intercede when, on the plaintiffs' version of events, he was present when the plaintiffs complained about the tightness of their handcuffs.  Similarly, a jury could find him liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the ground.  A jury could also find Detective Perron liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

> 3)     Carmine Verno

Detective Verno was one of the affiants who prepared the search warrant regarding Frank Nelson.  Verno entered the clubhouse with the Search Team, and his role was to handle any firearms located during the execution of the warrant.  Id. at ¶ 29.  He also personally searched and spoke to Frank Nelson.  Id. at ¶ 31.

The plaintiffs have presented sufficient evidence to find Detective Verno liable for failing to intercede when, on the plaintiffs' version of events, the plaintiffs

complained about the tightness of their handcuffs in his presence while detained inside the clubhouse.  Similarly, he may be liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the ground.  A jury could also find Detective Verno liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

### 4)   Patrick Cauley

Detective Cauley was one of the affiants who prepared the search warrant regarding Frank Nelson.  He was not present at the execution of the warrant, and is therefore not liable for any of the plaintiffs' remaining claims.  Accordingly, Detective Cauley's motion for summary judgment is GRANTED.

### 5)   Frank Griffin

Major Griffin was the senior officer-in-charge for the investigation which culminated in the execution of the search warrant.  Id. at ¶ 108.  Major Griffin assisted in the planning and briefing related to the execution of the search warrant.  Id. at ¶ 112.  He was responsible for the plan to photograph each occupant of the clubhouse. Id. at ¶ 114.   He was on the premises while the Search Team completed its activities. Id. at ¶ 116.

A reasonable jury could find Major Griffin liable for failing to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs. Similarly, a jury could find him liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the floor. As a supervisor, a jury could find Major Griffin liable for creating a policy that fostered

unlawful conduct for his role in creating the plan to photograph each occupant of the

clubhouse and for permitting prolonged detention in order to take individual

photographs unrelated to the objectives of the search warrant

Given his presence in the clubhouse, crediting the plaintiffs' version of events, a jury

could also find Major Griffin liable under several theories of supervisory liability,

including grossly negligent supervision and failing to take corrective action, when he

observed other law enforcement officers applying excessive force, failing to intervene

to prevent an excessive application of force, and engaging in impermissible search

activities, including taking individual pictures of the plaintiffs unrelated to the scope of

the search warrant.

 6) Peter Terenzi

Captain Terenzi was the commanding officer of the Narcotics Task Force.  He

was assigned to supervise the members of the Task Force as part of the Search

Team.  Id. at ¶ 232.  He entered the clubhouse after everyone had been handcuffed.

Id. at ¶ 233.  He claims, and plaintiffs deny, that he observed a  trooper assist a

heavy-set man who complained of being uncomfortable.  Id. at ¶ 235.

 The plaintiffs have come forward with sufficient evidence on which a

reasonable jury could find Captain Terenzi liable for failing to intercede when, on the

plaintiffs' version of events, the plaintiffs complained about the tightness of their

handcuffs in his presence while detained inside the clubhouse.  Similarly, he may be

liable for failing to intercede when the Tactical Team used an excessive amount of

force while the occupants were detained on the floor.  Given his presence in the

clubhouse, crediting the plaintiffs' version of events, a jury could also find Captain

Terenzi liable under several theories of supervisory liability, including grossly negligent

supervision and failing to take corrective action, when he observed other law

enforcement officers applying excessive force, failing to intervene to prevent an

excessive application of force, and engaging in impermissible search activities,

including taking individual pictures of the plaintiffs unrelated to the scope of the

search warrant.

7)   <u>Thomas Garbedian</u>

Lieutenant Garbedian was the commanding officer of the Statewide

Cooperative Crime Control Task Force, which included the State Police Gang Unit.

<u>Id.</u> at ¶ 237.  His assignment during the execution of search warrant was to supervise

the members of the Crime Control Task Force that had been assigned to the Search

Team.  <u>Id.</u>  Lieutenant Garbedian entered the compound with the Search Team.  <u>Id.</u> at

¶ 238.  In the clubhouse, he spoke to Marty Warren and informed him of the purpose

of the warrant.  <u>Id.</u> at ¶ 239.  According to Marty Warren, Lieutenant Garbedian

directed Warren to empty his pockets, and thus would be responsible for the seizure

of Warren's address book.  Lieutenant Garbedian "supervised operations" until all of

the occupants had been released and the search completed.  <u>Id.</u> at ¶ 242.

On the basis of the evidence put forward by the plaintiffs, a reasonable jury

could find Lieutenant Garbedian liable for seizing Marty Warren's address book.  A

jury could also find Lieutenant Garbedian liable for failing to intercede when, on the

plaintiffs' version of events, the plaintiffs complained about the tightness of their

handcuffs in his presence while they were detained inside the clubhouse.  Similarly,

he may be liable for failing to intercede when the Tactical Team used an excessive

-85-

amount of force while the occupants were detained on the floor.  Given his presence

in the clubhouse, crediting the plaintiffs' version of events, a jury could also  find

Lieutenant Garbedian liable under several theories of supervisory liability, including

grossly negligent supervision and failing to take corrective action, when he observed

other law enforcement officers applying excessive force, failing to intervene to prevent

an excessive application of force, and engaging in impermissible search activities,

including taking individual pictures of the plaintiffs unrelated to the scope of the

search warrant.

8)      <u>Robert Burgess</u>

Sergeant Burgess was the supervisor of the Gang Unit, and he was

responsible for drafting the plan for the execution of the search warrant, with the help

of Sergeant Daniel Lewis, and under the direction of Major Frank Griffin.  <u>Id.</u> at ¶ 35,

70-71.  Sergeant Burgess entered the compound after the lock was cut from the front

gate.  <u>Id.</u> at ¶ 76.  Sergeant Burgess claims, and the plaintiffs deny, that he adjusted

several people's position for comfort as he moved through the clubhouse.  <u>Id.</u> at ¶ 78.

Sergeant Burgess patted people down for weapons and assisted in the plan to check

for outstanding warrants on the detained occupants.  <u>Id.</u> at ¶¶ 79-80.   Sergeant

Burgess, along with Sergeant Edwards, supervised the search activities.   <u>Id.</u> at ¶ 117.

Sergeant Burgess was primarily responsible for the back of the clubhouse.  <u>Id.</u> at ¶

84.  According to Marty Warren, Sergeant Burgess directed Warren to empty his

pockets and thus would have seized Warren's address book.

A reasonable jury could find Sergeant Burgess liable for seizing Marty Warren's

address book.  A jury could also find Sergeant Burgess liable for failing to intercede

-86-

when, on the plaintiffs' version of events, the plaintiffs complained about the tightness of their handcuffs in his presence while they were detained inside the clubhouse. Similarly, he may be liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the floor.  Given his presence in the clubhouse, crediting the plaintiffs' version of events, a jury could also find Sergeant Burgess liable under several theories of supervisory liability, including grossly negligent supervision and failing to take corrective action, when he observed other law enforcement officers applying excessive force, failing to intervene to prevent an excessive application of force, and engaging in impermissible search activities, including taking individual pictures of the plaintiffs unrelated to the scope of the search warrant.

           9)    <u>Edward Gould</u>

Lieutenant Gould was a district commander in the Narcotics Task Force, and he supervised the Narcotics Task Force personnel who participated in the execution of the search warrant.  <u>Id.</u> at ¶ 244.  Lieutenant Gould entered the clubhouse with the Search Team.  <u>Id.</u> at ¶ 247.   When he observed a group of women become "verbally aggressive" after having their cuffs removed, Lieutenant Gould decided, "to avoid problems," to leave the remaining women handcuffed until their identities had been verified and they were ready to be released.  <u>Id.</u> at ¶ 248.  The plaintiffs deny that women occupants became verbally aggressive.  Lieutenant Gould claims, and the plaintiffs deny, that he examined the wrists of several occupants in response to their complaints and did not observe any open cuts or marks that appeared to require medical attention.  <u>Id.</u> at ¶ 249.  Lieutenant Gold remained on the premises after the

occupants were released, but did not participate in the search.  Id. at ¶ 250.

Taking the record before the court, a reasonable jury could find Lieutenant Gould liable for his decision to continue the detention of the occupants in handcuffs as it was unreasonable under the circumstances.  A jury could also find Lieutenant Gould liable for failing to intercede when, on the plaintiffs' version of events, the plaintiffs complained about the tightness of their handcuffs in his presence while they were detained inside the clubhouse.  Similarly, he may be liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the floor.  Given his presence in the clubhouse, crediting the plaintiffs' version of events, a jury could also find Lieutenant Gould liable under several theories of supervisory liability, including grossly negligent supervision and failing to take corrective action, when he observed other law enforcementofficers applying excessive force, failing to intervene to prevent an excessive application of force, and engaging in impermissible search activities, including taking individual pictures of the plaintiffs unrelated to the scope of the search warrant.

10)   Daniel Lewis

Master Sergeant Lewis was the Commanding Officer of the Emergency Services Unit, and he supervised the operations of the Tactical Team.  He assisted Sergeant Burgess in developing the tactical plan.  Id. at ¶ 94.  Lewis remained outside the OMC compound as the Tactical Team made their initial entry.  Id. at ¶ 101. Sergeant Lewis entered the clubhouse with the Search Team after he learned by radio that the clubhouse was secured.  Id. at ¶ 105.  He left the clubhouse with the Tactical Team.  Id. at ¶ 105.

The plaintiffs have come forward with sufficient evidence on which a reasonable jury could find that Master Sergeant Lewis is liable for failing to intercede when, on the plaintiffs' version of events, the plaintiffs complained about the tightness of their handcuffs while detained inside the clubhouse.  Similarly, he may be liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the floor.  Given his presence in the clubhouse, crediting the plaintiffs' version of events, a jury could also find Master Sergeant Lewis liable under several theories of supervisory liability, including grossly negligent supervision and failing to take corrective action, when he observed other law enforcement officers applying excessive force, failing to intervene to prevent an excessive application of force, and engaging in impermissible search activities, including taking individual pictures of the plaintiffs unrelated to the scope of the search warrant

    11)  <u>Robert Keeney</u>

Sergeant Keeney was a supervisor in the Domestic Terrorism Section of the Statewide Anti-Terrorism Task Force.  <u>Id.</u> at ¶ 259.  During the execution of the warrant, he was assigned to assist the Search Team.  <u>Id.</u> at ¶ 259.  He entered the clubhouse with the Search Team, after photographing the three individuals detained outside at the picnic table.  <u>Id.</u> at ¶ 260.  Inside the clubhouse, he was primarily responsible for taking photographs of the occupants as they were searched and identified.  <u>Id.</u> at ¶ 262.  He also took photographs of the premises for "investigative purposes."  <u>Id.</u> at ¶ 255.  He claims, and the plaintiffs deny, that he changed the position of Phil LaBonte Jr.'s handcuffs in response to his complaints.  <u>Id.</u> at ¶ 262.

A reasonable jury could find Sergeant Kenney liable for taking individual pictures to the extent that they constitute unreasonable searches and seizures, beyond the scope of the warrant, under the Fourth Amendment.  On the plaintiffs' version of events, a jury could also find him liable for failing to help Kelly Hemmeler when he photographed her and was not reasonably responsive to Hemmeler's complaints.  A reasonable jury could also find Sergeant Keeney liable for failing to intercede when, on the plaintiffs' version of events, he was present when the plaintiffs complained about the tightness of their handcuffs.  Similarly, he may be liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the floor.  A jury could also find Sergeant Keeney liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

      12)   Darren Edwards

      Sergeant Edwards was a supervisor in the Statewide Firearms Trafficking Task Force.  Along with Sergeant Burgess, Sergeant Edwards was assigned to directly supervise the execution of the warrant.  Id. at ¶ 251.  He entered the clubhouse with the Search Team.  Id. at ¶ 253.  He assisted Detective Verno in searching Frank Nelson.  Id. at ¶ 254.  He was informed by Sergeant Keeney that Keeney was taking digital photos of the premises for investigative purposes, and he was informed by Detective Gabianelli that she was taking Polaroid photos of the occupants before they left.  Id.

A jury could find Sergeant Edwards liable for failing to intercede when, on the plaintiffs' version of events, the plaintiffs complained about the tightness of their

handcuffs in his presence while they were detained inside the clubhouse.  Similarly, he may be liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the floor.  Given his presence in the clubhouse, crediting the plaintiffs' version of events, a jury could also find Sergeant Edwards liable under several theories of supervisory liability, including grossly negligent supervision and failing to take corrective action, when he observed other law enforcement officers applying excessive force, failing to intervene to prevent an excessive application of force, and engaging in impermissible search activities, including taking individual pictures of the plaintiffs unrelated to the scope of the search warrant.

    13)   Karen Gabianelli

    Detective Gabianelli entered the compound with the Search Team.  Id. at ¶ 285.  She approached three occupants, one of whom was presumably Kelly Hemmeler, situated at picnic table outside, in order to search and further secure them if necessary.  Id. at ¶ 286.  According to Hemmeler, Hemmeler was shivering uncontrollably due to the cold, and she complained that her handcuffs were too tight. Pls' Rule 56(a)(2) Statement, K. Hemmeler Aff., ¶¶ 9, 11.  Detective Gabianelli brought these individuals inside.  Defs' Rule 56(a)(1) Statement, ¶ 288.  She assisted in searching some of the female occupants.  She was also assigned to take Polaroid pictures of each occupant before he or she left, and she informed each occupant that the pictures were required before he or she could leave.  Id. at ¶ 290.

    A reasonable jury could find Detective Gabianelli liable for taking the individual pictures to the extent that they constitute unreasonable searches and seizures

beyond the scope of the search warrant under the Fourth Amendment.  A jury could also find her liable for failing to help Kelly Hemmeler when, on the plaintiffs' version of events, she was not reasonably responsive to Hemmeler's complaints.  A jury could find Detective Gabianelli liable for failing to intercede when, on the plaintiffs' version of events, the plaintiffs complained about the tightness of their handcuffs in her presence while detained inside the clubhouse.  Similarly, she may be liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the floor.

                14)   Julie Mooney

Detective Mooney entered the clubhouse with the Search Team.  Id. at ¶ 278. She observed the handcuffed occupants and assisted in searching the females for weapons.  Id. at ¶ 279.  Detective Mooney claims that she removed the cuffs from the women she patted down; the plaintiffs dispute this fact.  Id. at ¶ 280.

           The plaintiffs have presented sufficient evidence to find Detective Mooney liable for failing to intercede when, on the plaintiffs' version of events, the plaintiffs complained about the tightness of their handcuffs in her presence while detained inside the clubhouse.  Similarly, she may be liable for failing to intercede when the Tactical Team used an excessive amount of force while the occupants were detained on the floor.  A jury could also find Detective Mooney liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

                15)   Eric Stevens

Sergeant Stevens was not present at the clubhouse until "several hours" after

the initial entry by the Tactical Team.  Id. at ¶ 229.  When he arrived, he claims that

several occupants were still present, and he assisted two occupants seated at the bar

in moving their handcuffs from their back to their front in response to their complaints

of pain.  Id. at ¶ 230.   The plaintiffs deny that Sergeant Stevens helped anyone.  Pls'

Rule 56(a)(2) Statement, ¶ 230.

The plaintiffs have proffered sufficient evidence upon which a jury could

conclude that Detective Stevens is liable for failing to intercede when, on the plaintiffs'

version of events, the plaintiffs complained about the tightness of their handcuffs in

his presence while detained inside the clubhouse.  A jury could also find Detective

Stevens liable for failing to intercede when photographs that did not further a

legitimate government interest were taken of individual plaintiffs.

16)   Justin Kelley

Sergeant Kelley was the Executive Officer of the Emergency Services Unit, and

a member of the Tactical Team.  Id. at ¶ 139.  He was assigned as the "Team Leader"

of the front entry team, and he had supervisory responsibility for the actions of the

members of his team.  Id.   With Trooper Voket, he formulated the Tactical Plan for

the execution of the search warrant.  Id. at ¶ 140.  Kelley entered the clubhouse

through the front entry with the Tactical Team.  Id. at ¶ 143.  He was present as

members of the Tactical Team ordered everyone to the floor and began to handcuff

and search each occupant for weapons.  Id. at ¶ 143.  He recalls seeing, and the

plaintiffs deny, two older, heavy-set occupants with medical conditions being moved to

the couch for their comfort.  Id.

A reasonable jury could find Sergeant Kelley liable for using an excessive

-93-

amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure. Given his presence in the clubhouse, crediting the plaintiffs' version of events, a jury could also find Sergeant Kelley liable under several theories of supervisory liability, including grossly negligent supervision and failing to take corrective action, when he observed other law enforcement officers applying excessive force, failing to intervene to prevent an excessive application of force, and engaging in impermissible search activities, including taking individual pictures of the plaintiffs unrelated to the scope of the search warrant.

    17)    Joseph Voket

Trooper Voket was a member of the Tactical Team, and he served as an "assistant team leader" for the front entry team.  Id. at ¶ 186.  As such, he had supervisory responsibility for the actions of the members of the front entry team.  Id. at ¶ 186.  Trooper Voket assisted Trooper Dubuc in securing the occupants located outside, including, presumably, Kelly Hemmeler.  Id. at ¶ 187.  He followed the other members of the front entry team into the clubhouse.  Id. at ¶ 187.  He claims, and the plaintiffs deny, that he adjusted the handcuffs on a heavy-set occupant for comfort. Id. at ¶ 189.

A reasonable jury could find Trooper Voket liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could also find Trooper Voket liable when he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs.  Given his

presence in the clubhouse, crediting the plaintiffs' version of events, a jury could also find Trooper Voket liable under several theories of supervisory liability, including grossly negligent supervision and failing to take corrective action, when he observed other law enforcement officers applying excessive force, failing to intervene to prevent an excessive application of force, and engaging in impermissible search activities, including taking individual pictures of the plaintiffs unrelated to the scope of the search warrant.

 18) <u>Jeffrey Dubuc</u>

Trooper Dubuc was a member of the Tactical Team on the night of the execution of the search warrant.  He helped secure the individuals outside of the clubhouse, presumably including Kelly Hemmeler.  Def's Rule 56(a)(1) Statement, ¶ 159.  He ordered the individuals to get on their knees.  <u>Id.</u> at ¶ 158.  According to Trooper Dubuc, he then pursued a subject who had run toward the clubhouse.  <u>Id.</u> at ¶ 159.  Trooper Dubuc participated in the initial front entry into the clubhouse, although he did not personally pat down or handcuff any of the occupants.  <u>Id.</u> at ¶ 164.

A reasonable jury could find Trooper Dubuc liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A reasonable jury could also find Trooper Dubuc liable for failing to intercede when, on the plaintiffs' version of events, he was present when the plaintiffs complained about the tightness of their handcuffs.

 19) <u>Mark Wyler</u>

-95-

Trooper Wyler was a member of the Tactical Team, and he followed Trooper Dubuc into the Outlaws compound.  Id. at ¶ 179.  Wyler observed while the occupants outside, including, presumably, Kelly Hemmeler, were detained, and he remained in that area as the Tactical Team cut the lock off the entrance gate.  Id. at ¶ 180.  He entered the clubhouse when the Search Team entered to join the other members of the Tactical Team.  Id. at ¶ 180.  Inside, he handcuffed an individual near the pool table.  Id. at ¶ 181.  He left the clubhouse with the rest of the Tactical Team.  Id. at ¶

A reasonable jury could find Trooper Wyler liable for failing to intercede when, on the plaintiffs' version of events, Kelly Hemmeler was subjected to an unreasonable amount of force while detained on the floor near the compound gate.  A reasonable jury could also find Trooper Wyler liable for failing to intercede when, on the plaintiffs' version of events, he was present when the plaintiffs complained about the tightness of their handcuffs.  Similarly, a jury could find him liable for failing to intercede when the Tactical Team pointed their weapons at detained occupants and permitted police dogs to harass detained occupants on the floor.  A jury could also find Trooper Wyler liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

    20) Raoul Palen

Sergeant Palen was a member of the Tactical Team, and he was assigned as the team leader for the front entry team.  Id. at ¶ 192.  As such, he had supervisory responsibility for the members of the front entry team.  Sergeant Palen observed as the three occupants outside were secured, and he entered the clubhouse with the front entry team.  Id. at ¶ 193-96.  He observed as other members of the Tactical

Team searched and handcuffed the occupants of the clubhouse.  Id. at ¶ 196.

Gary Piscottano has identified Sergeant Palen as the defendant who allegedly stepped on his back and pulled his hair to twist his head.  G. Piscottano Aff., ¶ 12.

The plaintiffs have come forward with sufficient evidence on which a reasonable jury could find Sergeant Palen liable for his direct involvement in the unreasonable application of force to Piscottano.  A reasonable jury could also find Sergeant Palen liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could also find Sergeant Palen liable when he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs.  Given his presence in the clubhouse, crediting the plaintiffs' version of events, a jury could also find Sergeant Palen liable under several theories of supervisory liability, including grossly negligent supervision and failing to take corrective action, when he observed other law enforcement officers applying excessive force, failing to intervene to prevent an excessive application of force, and engaging in impermissible search activities, including taking individual pictures of the plaintiffs unrelated to the scope of the search warrant.

21)    Steven Orlowski

Trooper Orlowski was a member of the Tactical Team.  Defs' Rule 56(a)(1) Statement, ¶ 200.  Trooper Orlowski carried a gas-power steel saw, presumably the same saw that allegedly made contact with Kelly Hemmeler's head, and he cut the chain on the gate to the compound using the saw.  Id. at ¶ 200.  According to Hemmeler, Orlowski refused her request to allow her to get up from the cold ground

and to get a jacket.  Trooper Orlowski then joined the Tactical Team inside, where the situation appeared to him to be under control.  Id. at ¶ 203.  He flex-cuffed several individuals and confiscated a pocket knife from an occupant.  Id. at ¶ 203.  He claims that he flex-cuffed a heavy-set man with six sets of flex-cuffs so as to make him comfortable, a fact which the plaintiffs deny.  Id. at ¶ 204.  Trooper Orlowski also observed three outside occupants, presumably including Kelly Hemmeler, situated at a picnic table when he left the clubhouse.  Id. at ¶ 205.

A reasonable jury could find Trooper Orlowski liable for his direct participation in the application of excessive force to Kelly Hemmeler.  A reasonable jury could find Trooper Orlowski liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could also find Trooper Orlowski liable when he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs, as well as liable for unreasonably failing to alleviate the conditions of detention of Kelly Hemmeler after observing her outside when he left the clubhouse.  A jury could also find Trooper Orlowski liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

### 22)   Arthur Walkley

Trooper Walkley was a member of the Tactical Team.  Id. at ¶ 183.  He entered the compound with the front entry team, ordered several individuals to the floor, and "placed his feet next" to them to ensure they would not move as he surveyed the room.  Id. at ¶ 184.  Walkley assisted in confiscating a gun from an

occupant.  Id. at ¶ 185.  He departed the clubhouse with the rest of the Tactical Team.

A reasonable jury could find Trooper Walkley liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could also find Trooper Walkley liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs.   A jury could also find Trooper Walkley liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

                       23)    Christopher Lunz

Trooper Lunz was a member of the Tactical Team, and he served as the "breacher" for the front door entry team.  Id. at ¶ 166.  Lunz entered through the front, and he helped secure the occupants and retrieve several weapon from them.  Id. at ¶ 171.  He did not personally handcuff anyone.  Id.   Lunz also claims, and the plaintiffs deny, that he have assisted an older, heavy-set man with a heart problem in moving from the floor to the couch.  Id. at ¶ 172; Pls' Rule 56(a)(2) Statement, ¶ 172.

A reasonable jury could find Trooper Lunz liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could also find Trooper Lunz liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs.  A jury could also find Trooper Lunz liable for failing to intercede when photographs that did not further a legitimate government interest were taken of

individual plaintiffs.

24) <u>Trooper Zonghetti</u>

Trooper Zonghetti was a member of the Tactical Team, and he assisted in the breach of the front door.  He states that he did not himself pat down or handcuff any of the occupants, but instead watched while other members of the Tactical Team secured the occupants of the clubhouse.

A reasonable jury could find Trooper Zonghetti liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could find Trooper Zonghetti liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs.  A jury could also find Trooper Zonghetti liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

25) <u>Daniel McCarthy</u>

Trooper McCarthy was a member of the Tactical Team, and he was assigned to the rear entry team.  Defs' Rule 56(a)(1) Statement, ¶ 149.  In his initial entry, he encountered a non-compliant occupant whom he directed to get on the floor several times before he grabbed the individual's shoulders and "spun him around."  <u>Id.</u> at ¶ 150.  The plaintiffs dispute this version of events.  Trooper McCarthy "assisted in getting the occupants down on the floor," and he searched and handcuffed the occupants.  <u>Id.</u> at ¶ 151-52.  He claims to have retrieved, for a female occupant, an inhaler from a pocketbook, <u>id.</u> at ¶ 152, which the plaintiffs deny.  Pls' Rule 56(a)(2)

Statement, ¶ 152.

A reasonable jury could find Trooper McCarthy liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure. A jury could find Trooper McCarthy liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs. A jury could also find Trooper McCarthy liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

26)   <u>Christopher Toney</u>

Trooper Toney was a member of the Tactical Team, and he entered through the rear door. Defs' Rule 56(a)(1) Statement, ¶ 135. He helped secure an occupant in the kitchen of the clubhouse, and then assisted in securing people in the main room. <u>Id.</u> at ¶ 137. He heard several occupants complain of preexisting medical conditions, and claims that they were assisted, which the plaintiffs deny. <u>Id.</u> at ¶ 137. He did not personally search anyone, but was present while everyone on the premises was search. <u>Id.</u> at ¶ 138.

A reasonable jury could find Trooper Toney liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure. A jury could find Trooper Toney liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs. A jury could also find Trooper Toney liable for failing to intercede

when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

27)   Joseph Mercer

Sergeant Mercer was a member of the Tactical Team, and he served as the "breacher" for the rear entry team.  Id. at ¶ 119.   He used a ram to break down the rear door.  Id. at ¶ 123.   Sergeant Mercer assisted in searching some occupants for weapons and secured some with handcuffs and flex-cuffs.  Id. at ¶ 127.  He claims to have assisted an occupant that had asthma be cuffed in front of her rather than behind her, id. at ¶ 128,  which the plaintiffs deny.  Pls' Rule 56(a)(2) Statement, ¶ 128.

A reasonable jury could find Sergeant Mercer liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could find Sergeant Mercer liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs.  A jury could also find Sergeant Mercer liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

28)   Eric Basak

Trooper Basak was a member of the Tactical Team, and he assisted in the entry through the rear door.  According to Basak, he pulled the speaker wires out from the rear of a studio when he could not find the power switch to turn it off.  Defs' Rule 56(a)(1) Statement, ¶ 133.  He "covered" an occupant with his weapon while a gun

was confiscated from the occupant.  Id. at ¶ 133.  He left with the other members of the Tactical Team.  Id. at ¶ 134.

A reasonable jury could find Trooper Basak liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could find Trooper Basak liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs.  A jury could also find Trooper Basak liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

29)   Michael Alogna

Trooper Alogna was a member of the Tactical Team, and he was assigned as a canine handler.  Id. at ¶ 217.  He was present with his "canine partner" while the occupants were secured.  Id. at ¶ 219.  While Trooper Alogna claims that he removed his dog from the scene when he saw that things appeared to go smoothly, the plaintiffs have claimed that the police dogs were present among the occupants in the clubhouse while the occupants were detained and on the floor.

A reasonable jury could find Trooper Alogna liable for subjecting the plaintiffs to an unreasonable use of force involving his police dog while the plaintiffs were detained.   A reasonable jury could find Trooper Alogna liable for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could find Trooper Alogna liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their

handcuffs.  A jury could also find Trooper Alogna liable for failing to intercede when photographs that did not further a legitimate government interest were taken of individual plaintiffs.

         30)    James Kodzis

Like Trooper Alogna, Trooper Zodzis was a member of the Tactical Team and was assigned as a canine handler.  Id. at ¶ 213.   He claims that his canine partner remained outside of the clubhouse, which the plaintiffs deny.  Id. at ¶ 216.

A reasonable jury could find Trooper Zodzis liable for subjecting the plaintiffs to an unreasonable use of force involving his police dog while the plaintiffs were detained.  A reasonable jury could find Trooper Kodzis liable for using an excessive amount of force following the initial entry into the clubhouse, and for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could also find Trooper Zodzis liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs.

         31)    Jeffrey Covello

Trooper Covello was a member of the Tactical Team.  Id. at ¶ 207.  He assisted Trooper Orlowski in cutting through the lock on the front gate with a saw.  Id. He also entered the clubhouse, where he flex-cuffed several individuals, and also observed the situation "to be sure that things remained under control."  Id. at ¶ 208-9. He also claimed to have helped a heavy-set occupant sit in a more comfortable position, id. at ¶ 209, which the plaintiffs deny.  Pls' Rule 56(a)(2) Statement, ¶ 209.

He left the clubhouse with the Tactical Team; in doing so, he observed the subjects who had been detained outside at the picnic table.  Defs' Rule 56(a)(1) Statement, ¶ 210.

A reasonable jury could find Trooper Covello liable for failing to intercede when Trooper Orlowski's actions in using the saw caused Kelly Hemmeler to experience an unreasonable application of force.   A reasonable jury could find Trooper Covello liable for failing to intercede to prevent an excessive display of force after the clubhouse was secure.  A jury could also find Trooper Covello liable when, on the plaintiffs' version of events, he failed to intercede to respond to the complaints of the plaintiffs regarding the tightness of their handcuffs.

>32)   William Rochette

Trooper Rochette was a member of the Tactical Team, and he was assigned as the Tactical Team Medic.  Id. at ¶ 222.  He was charged with providing emergency medical care to anyone who might have been injured the Tactical Team operations. Id. at ¶ 222.  Trooper Rochette remained outside the clubhouse to watch the occupants, presumably including Kelly Hemmeler, who had been detained outside. Id. at ¶ 225.  In response to one of the detained women's complaint that she was cold, Rochette told her that there was "nothing he could do."  Id. at ¶ 225.   He claims that the occupants were detained on the ground for no more than five minutes, id., which the plaintiffs deny.  Pls' Rule 56(a)(2) Statement, ¶ 225.  Trooper Rochette remained outside during the entry and search of the clubhouse.

A reasonable jury could find Trooper Rochette liable for failing to reasonably

respond to Kelly Hemmeler's complaints about her conditions of detention. However, because he did not enter the clubhouse, he cannot be liable for any conduct that took place there.

### E.    Equal Protection Claim

In their complaint, the plaintiffs assert a claim under the Equal Protection Clause of the Fourteenth Amendment, alleging that the defendants have wrongfully interfered with the plaintiffs' ability to rent private facilities for the purpose of holding social gatherings. At oral argument, the plaintiffs conceded that they have not produced admissible evidence in support of this claim with regard to any defendant named in this action. Accordingly, summary judgment is GRANTED to the defendants on the plaintiffs' equal protection claim regarding their difficulty in renting private facilities.

The plaintiffs' complaint also asserts an equal protection claim alleging that certain plaintiffs have been stopped without reasonable suspicion or probable cause, and have been required to provide identification and be photographed. Phil LaBonte's affidavit states that he has been stopped by "police" while riding his motorcycle, but does not identify any particular defendant or state that he has been stopped by a member of the state police. LaBonte Aff., ¶ 13. Therefore, he has not produced sufficient evidence upon which a reasonable jury could find any defendant liable. Summary judgment is GRANTED in favor of the defendants on his claim.

Allison Piscottano states that, in the summer of 2003, she attended a function at the clubhouse at which she took pictures of the police that were "conducting

'surveillance'" of them from across the street.  A. Piscottano Aff., ¶ 17.  Later, as she was leaving the club house as a passenger Kelly Hemmeler's car, she put her seat belt on as Hemmeler pulled into the street.  Id.  Piscottano and Hemmeler were soon pulled over by Detective Williams, and were told that they were pulled over for "seat belt violations."  Id.  Detective Williams checked their identification, and, according to Piscottano, said: "I expect them . . . to take my picture, not a correctional officer's wife."  Id. (emphasis in original).  She also stated that his body language and voice demonstrated that he was angry.  Id.  In relation to this incident, Kelly Hemmeler states that, "I was told that we were being stopped for not having our seat belt on.  My seat belt was on and my passenger just clicked hers on before I entered the street."  K. Hemmeler Aff., ¶ 23.

To succeed on an equal protection claim alleging selective prosecution, a plaintiffs must show "(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2004).   The plaintiffs have not produced any evidence demonstrating that other people whose seat belts were not completely fastened before entering the street have not been treated in a similar fashion.  Accordingly, summary judgment is GRANTED in favor of the defendants on Kelly Hemmeler's and Allison Piscottano's equal protection claim.

**IV.   CONCLUSION**

For the foregoing reasons, the plaintiffs' motion for partial summary judgment

[Doc. No. 111] is DENIED.  The plaintiffs' motion in limine [Doc. No. 115] is GRANTED in part and DENIED in part.  The defendants' motion for summary judgment [Doc. No. 125] is GRANTED in part and DENIED in part.  The plaintiffs' motion for reconsideration [Doc. No. 139] is DENIED.  The plaintiffs' action is dismissed in its entirety against Patrick Cauley and against the Commission of Public Safety in his individual capacity.

**SO ORDERED.**

Dated this 31st day of March, 2006, at Bridgeport, Connecticut

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge